**TEAMSTERS LOCAL UNION
NO. 122, Plaintiff,**

v.

**AUGUST A. BUSCH & CO. OF
MASSACHUSETTS, INC.,
Defendant.**

**Civ. A. No. 95–10494–JLT.**

United States District Court,
D. Massachusetts.

June 26, 1996.

Stephen R. Domesick, Boston, MA, for Plaintiff.

David B. Ellis, Arthur G. Telegen, James W. Bucking, Foley, Hoag & Eliot, Boston, MA, for Defendant.

### MEMORANDUM

TAURO, Chief Judge.

Teamsters Local Union No. 122 (the "Union") brings this action to compel August A. Busch & Co. of Massachusetts, Inc. ("AAB") to arbitrate a dispute regarding AAB's decision to change night warehouse crew schedules. Presently before the court are the parties' cross-motions for summary judgment.

### I.

### BACKGROUND

AAB operates a wholesale beer distributorship in Medford, Massachusetts. Since 1967, the Union has been the recognized collective-bargaining representative for a unit of employees of AAB comprised of the positions driver, helper, warehouseman, and mechanic. On December 18, 1991, AAB and the Union executed a collective-bargaining agreement (the "1991 Agreement"). Three aspects of that agreement are germane to the present controversy.

First, the 1991 Agreement contains dispute resolution and no-strike provisions. Article 7 of the 1991 Agreement provides for grievance and arbitration procedures relating to disputes arising under the agreement. Under Article 8, the parties promise that "[t]hroughout the term of this Agreement, there shall be no strike, lockout or cessation of work; but all grievances and disputes shall be settled under the grievance procedure of this Agreement."

Second, the 1991 Agreement contains provisions relating to the operational schedule of AAB and the assignment of bargaining unit members to shifts in the schedule. Specifically, Article 10 provides:

> Section 1. ... Notwithstanding the foregoing, it is agreed that [AAB], on appropriate notice to the Union pursuant to the following section, reserves the right to schedule the night loading crew on a Sunday through Thursday work week.

> Section 2. It is recognized that the work schedule of the warehouse crew must be related to the volume of work performed during any warehouse shift with recognition of the primary activities during such shift. It is further recognized, however, that employees assigned to any given work shift must be prepared as directed to perform any duties within the warehouse which they are qualified to perform, whether or not embraced in the primary work function for that shift as [AAB] needs or lack of available work in the primary area may indicate. It is further agreed that [AAB] must, of necessity, retain the right to alter schedules, either as to the work week, pursuant to Section 1 above, the starting of time of a given work shift within a work week, crew size or primary functions. [AAB] agrees, however, that no such change in work schedules will be made without two (2) weeks' advance notice to the Union during which period the Union shall be afforded an explanation of the need for the change and the number of employees to be affected thereby, and shall have the opportunity to discuss the matter.

> It is agreed that [AAB]'s exercise of its rights under this provision or any other provision of this Agreement where matters are left to its discretion shall be in good faith and not arbitrary or capricious.

Article 6, Section 6 provides that employees "will bid semi-annually in order of seniority, and by seniority preference, for the available positions" of day warehouse, night warehouse, driver, and helper positions. Additionally, under a December 3, 1985 side letter of agreement between the parties, employees affected by changes made to the schedule pursuant to Article 10 may rebid starting times and classifications.

Finally, Article 25 provides the terms for expiration and renewal of the agreement. It reads:

> This Agreement shall be in full force and effect from December 1, 1991 and shall continue through November 13, 1994, and shall not be reopened by either party for any reason whatsoever and shall automatically continue thereafter from year to year until either party serves notice in writing

sixty (60) days prior to any expiration date of the desire to change or terminate this contract. The party filing such notice of termination shall meet with representatives of the other party no later than fifteen (15) days after giving such notice for the purpose of submitting in writing its proposals for a new contract or changes in the old one.

Pursuant to Article 25, the Union provided notice to AAB on August 15, 1994 of its desire to bargain "a new collective bargaining agreement . . . for the period commencing November 14, 1994." On August 22, 1994, the Union filed a "Notice to Mediation Agencies" which stated that the Union had served written notice of termination on AAB and that the 1991 Agreement would expire on November 13, 1994. The Union filed this Notice as a prerequisite to engaging in protected economic action against AAB, including a strike.

The parties commenced negotiating the terms of a new agreement in October 1994. At some point during these negotiations, the Union stated that it may go on strike if there was no agreement by November 13, 1994.

On November 9, 1994, away from the bargaining table, AAB asked the Union's representative whether the Union would agree to have a federal mediator come into negotiations and whether the Union was interested in extending the 1991 Agreement. The Union declined this offer. In his affidavit, the Union representative explains that it was his "view that keeping AAB uncertain about whether we intended to strike after the contract lapsed on November 13, 1994 was a sensible bargaining strategy. AAB's uncertainty, I concluded, might well cause the Company to pull some of its proposals off the table in order to get the Union to agree to a formal extension."

On November 10, 1994, AAB offered, at the bargaining table, to extend the 1991 Agreement. The Union replied that it would not agree to an extension unless AAB withdrew some of its proposals.[1] The 1991 Agreement expired on November 13, 1994. Upon termination of the 1991 Agreement, members of the Union continued to report to work and AAB continued to operate in conformance with the terms of the expired agreement.

At about the time that the 1991 Agreement expired, the Union decided not to strike. Instead, in late November 1994, the Union commenced a consumer boycott against AAB products. Some of the tactics employed by the Union in the course of that consumer boycott have been the subject of prior examination by this court. See Pye v. Teamsters Local Union No. 122, Int'l Bhd. of Teamsters, AFL–CIO, 875 F.Supp. 921, 923 (D.Mass.), aff'd, 61 F.3d 1013 (1st Cir.1995); Simmonds v. Teamsters Local Union No. 122, Int'l Bhd. of Teamsters, AFL–CIO, 928 F.Supp. 71 (D.Mass.1996).

In January 1995, the parties exchanged correspondence regarding a grievance, which had arisen prior to the expiration of the 1991 Agreement, regarding employees wearing stickers that read "I want a Lite duty job." On January 3, 1995, AAB advised the Union that it would agree to submit the dispute to arbitration, but added:

> [AAB]'s willingness to submit this issue to the arbitration procedure set forth in the now-expired labor agreement is not intended to constitute and should not be construed as agreement by [AAB] to submit other disputes to arbitration pursuant to the expired labor agreement. Such disputes, if any, will be considered by [AAB] and discussed with the Union on a case-by-case basis.

---

**1.** In their affidavits filed in support of AAB's opposition to the Union's motion for summary judgment, Eric Schmitz and Pat Knipper characterized the suggestion on November 10 as being to the effect that "the parties sign an extension" to the 1991 Agreement. In their reply to AAB's opposition, the Union offered the supplemental affidavit of John Murphy, in which he states that "Mr. Schmitz did not propose that the Union

sign an extension agreement." (emphasis in original). Subsequently, in AAB's memorandum in support of its motion for summary judgment, AAB proffered as an uncontested fact that at the bargaining table on November 10 it offered to extend the agreement. The Union has not contested this characterization of the November 10 meeting.

On January 9, 1995, the Union replied that AAB's "obligation to submit contractual disputes to arbitration is regulated by the terms of the agreement, the nature of the particular dispute and by the Supreme Court's decision in *Litton Financial Printing Div. v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177, 137 LRRM 2441 (1991), and its progeny." [2]

In early February 1995, the semi-annual bidding for positions took place. On February 6, 1995, employees bid for and were awarded warehouse jobs, including fourteen employees scheduled to work the Monday through Friday work schedule as the night loading crew.

On February 15, 1995, AAB notified the Union that it intended, effective March 5, 1995, to change the work schedules of its night loading crew to a Sunday through Thursday shift and to eliminate the 3:00 a.m. loading shift. AAB explained:

> The reason for this change is to minimize the amount of time the product is left outside of our controlled environment warehouse. Currently, when we load trucks on Friday night, they remain outside of our controlled environment warehouse until Monday morning. By going to a Sunday through Thursday schedule, we will minimize the time product is stored outside of the [controlled environment workhouse] area. This will help ensure and protect the quality of our products.

AAB posted the new classifications for bidding.

The Union objected to this proposed change, contending AAB's reason did not satisfy the alleged Article 10 requirement that any schedule modification relate to a change in the volume of the product. In a February 28, 1995 letter, AAB expressed its disagreement with the Union's interpretation of Article 10 and stated that it was willing to meet to discuss the dispute. AAB also stated that its "interest in meeting to address

this dispute is based on its legal obligation to continue dealing with the union as the representative of members of the bargaining unit; it should not be construed as agreement by [AAB], at this time, to submit this particular dispute to binding arbitration."

The parties were unable to resolve the dispute informally and, after completion of the two-step grievance procedure, the Union requested that the dispute be submitted to arbitration. AAB refused. On March 10, 1995, the Union filed this suit seeking to compel AAB to arbitrate the work schedule dispute.

## II.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is not genuine if the record, taken as a whole, could not support a verdict for the nonmoving party. *See Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 351–52 (1st Cir.1992). In viewing the record, the court examines the evidence and draws all inferences in the light most favorable to the nonmoving party. *Siegal v. American Honda Motor Co., Inc.,* 921 F.2d 15, 17 (1st Cir.1990).

## III.

### DISCUSSION

The Union advances two alternative theories in support of its claim that AAB has agreed to arbitrate the warehouse schedule dispute. First, the Union contends that the dispute concerns a right arising under the 1991 Agreement and, therefore, is arbitrable under Article 7. Second, the Union avers

---

**2.** AAB maintains that the letter represents a concession by the Union that AAB's obligation to arbitrate was limited to disputes "arising under" the 1991 Agreement, as that term is explained in the Supreme Court's decision in *Litton.* The Union contends that this is not the only permissible inference that can be drawn from the letter. For the purpose of deciding the instant motions, the court will assume that the January 9, 1996 letter does not constitute the concession suggested by AAB.

that the postexpiration conduct of the parties has given rise to an implied-in-fact collective-bargaining agreement under which AAB is required to arbitrate the present dispute. The court addresses each contention in turn.

## A. *The Dispute Does Not Arise Under the 1991 Agreement*

■ The seminal case with respect to the Union's first contention is *Litton Fin. Printing Div. v. National Labor Relations Board*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). In *Litton*, the Supreme Court addressed the scope of an employer's obligation under an expired collective-bargaining agreement to arbitrate grievances commenced after the agreement's expiration. *Id.* at 205–08, 111 S.Ct. at 2224–26. The Court observed that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 207, 111 S.Ct. at 2225–26. The Court explained that this contract doctrine controls, despite the fact that national labor policy strongly favors arbitration as fostering industrial peace, because arbitration is a creature of consent. *Id.* 205–07, 111 S.Ct. at 2224–26. Employers and employees cannot be compelled to arbitrate disputes unless they have agreed to arbitrate. *Id.*

In light of these considerations, the Court held that postexpiration grievances are arbitrable only if they "arise under" the expired collective-bargaining agreement. *Id.* The Court articulated three exceptions to the general rule that contractual obligations cease upon termination of an agreement: a postexpiration grievance "arises under" the expired contract only "[1] where it involves facts and occurrences that arose before expiration, [2] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [3] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.* at 205–206, 111 S.Ct. at 2225.

The Union invokes the second exception of *Litton*, contending that Article 6, Section 6 vested employees with the right to bid for a specific work schedule and the right to re-

main on that schedule absent a change in the volume of beer to be loaded. The Union, however, fails to point to any language in this provision that suggests that these contractual rights vested in the employees beyond the term of the agreement. By its plain language, Article 6, Section 6 merely creates a contractual mechanism for bidding positions and explains the role of seniority in that bidding process. In other words, it defines the manner in which work will be undertaken during the life of the contract, rather than conferring a vested benefit on employees. *Cf. Cadillac Indus., Inc. v. Amalgamated Clothing & Textile Workers Union*, 775 F.Supp. 30, 33 (D.P.R.1991) (right to be discharged only for just cause did not extend beyond contract termination). The fact that AAB retained discretion to alter the work schedule during the term of the agreement reinforces the conclusion that the work schedule was not a right vested in the employees.

Alternatively, the Union maintains that AAB's obligation to arbitrate the present dispute arises under the third exception articulated in *Litton*. The Union constructs a novel argument in support of this contention. As Justice Kennedy explained with respect to the third exception, "if a collective-bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions." *Litton*, 501 U.S. at 207–08, 111 S.Ct. at 2226. As such, one would ordinarily expect to look at the provision of the agreement relating to the contested benefit to determine whether it survived termination. The Union, however, does not cite any language from Article 6, Section 6 or Article 10 of the 1991 Agreement to suggest that the work schedule benefit survived expiration. Instead, the Union points to postexpiration conduct by AAB— the submission of the Lite sticker grievance to arbitration—as support for the claim that Article 7 of the 1991 Agreement provides for arbitration of postexpiration disputes.[3]

---

**3.** It is unclear from the Union's briefs whether it

views the postexpiration conduct as (1) establish-

The Union's contention that the arbitration provision survived is meritless for two reasons. First, nothing in the language of Article 7 remotely indicates that it would survive termination of the agreement. Indeed, the Union fails to point to any language in the arbitration clause of the 1991 Agreement that would distinguish it from the arbitration provision before the Supreme Court in *Litton*. *See Litton*, 501 U.S. at 193–94, 111 S.Ct. at 2218–19. Moreover, *Litton* described how an arbitration clause could be drafted to impose a continuing obligation to arbitrate postexpiration disputes:

> If, as the Union urges, parties who favor labor arbitration during the term of a contract also desire it to resolve postexpiration disputes, the parties can consent to that arrangement by explicit agreement. Further, a collective-bargaining agreement might be drafted so as to eliminate any hiatus between expiration of the old and execution of the new agreement.

*Id.* 501 U.S. at 201, 111 S.Ct. at 2222. Here, the arbitration provision contains no explicit provision for postexpiration arbitration.[4]

Second, as the language of Article 7 is not ambiguous, the extrinsic evidence upon which the Union relies is irrelevant to the court's inquiry. *See Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607–08 (7th Cir.) (en banc) ("extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them"), *cert. denied*, 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). Moreover, while extrinsic evidence may be admitted to show that a seemingly clear contract provision is ambiguous, *id.* at 608, the extrinsic evidence proffered by the

Union fails to implicate such ambiguity. In submitting the Lite sticker grievance to arbitration, AAB specifically stated that its willingness to submit that dispute to arbitration should not be construed as an agreement to submit other disputes to arbitration.

For these reasons, the court concludes that AAB has no obligation to arbitrate the work schedule dispute under the 1991 Agreement.[5]

**B. *The Dispute is Not Subject to An Implied–In–Fact Agreement to Arbitrate Postexpiration Disputes***

 The Union's fallback position is that an implied-in-fact agreement to arbitrate exists between the parties. It is well established that federal courts have jurisdiction to enforce interim agreements reached by parties after a collective-bargaining agreement has expired. *See, e.g., United Paperworkers Int'l Union, AFL–CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 802 (8th Cir.1996); *Local Union No. 884, United Rubber, Cork, Linoleum, and Plastic Workers of America v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1353 (8th Cir.1995); *International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers—Local 1603 v. Transue & Williams Corp.*, 879 F.2d 1388, 1392–93 (6th Cir.1989). Further, it is a commonplace of contract law that a contract need not be express, but may be implied from the conduct of the parties. *Cf. Restatement (Second) of Contracts* §§ 4 and 19 (1981). To determine whether an implied-in-fact agreement has arisen here, the court must examine how these uncontroversial propositions apply to postexpiration conduct

---

ing an intention by AAB to be bound to a new agreement to arbitrate, or (2) evidencing AAB's understanding that on its own terms Article 7 encompasses postexpiration grievances. As the former is simply another way of articulating the Union's implied-in-fact theory, the court assumes for present purposes the latter construction of the Union's argument.

**4.** Some courts interpreting *Litton* have held that absence of express language that a contract term vests or survives is fatal to a claim that a dispute is arbitrable under an expired agreement. *Compare Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 610–14 (7th Cir.1993) (Cudahy, J. concurring) *with Senn v. United Dominion Indus., Inc.*, 951

F.2d 806, 816 (7th Cir.1992), *cert. denied*, 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). Because the court concludes below that the Union's appeal to extrinsic evidence fails to support its reading of the contract, the court need not decide whether the lack of express language in the Article 7 by itself defeats the Union's reading.

**5.** Whether an expired collective-bargaining agreement creates a duty for the parties to arbitrate a particular postexpiration grievance is a matter of law for the court to determine. *Cadillac Indus., Inc. v. Amalgamated Clothing & Textile Workers Union*, 775 F.Supp. 30, 31 (D.P.R. 1991).

of parties in the collective-bargaining context.

### 1. *The Third Circuit approach*

The Union urges the court to follow the path blazed by the Third Circuit in *Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery and Tobacco Workers' Int'l Union of America* ("*Luden*"), 28 F.3d 347 (3rd Cir.1994). In *Luden*, the court held that (1) where a collective-bargaining agreement expires and (2) where the parties continue to act in accordance with the terms of the expired agreement, a presumption arises that, as a matter of the federal common law of labor contracts, the parties have entered into an implied-in-fact agreement comprising the terms of the expired contract, including its arbitration provision. *Id.* at 355–56. A party can defeat formation of this implied-in-fact contract only by showing:

(i) both parties in fact intend the term not to survive, or

(ii) under the totality of the circumstances either party to the lapsed [collective-bargaining agreement] objectively manifests to the other a particularized intent, be it expressed verbally or non-verbally, to disavow or repudiate that term.

*Id.* at 364.

AAB contends that the court should decline to adopt the approach developed by the Third Circuit in *Luden*. For the reasons that follow, the court agrees.

*Luden*'s approach essentially shifts the burden of establishing the nonexistence of an implied-in-fact contract to the employer. In the context of ordinary employment contracts, the shifting of this burden may make some sense. The expiration of an employment contract extinguishes all further legal obligation of the parties to abide by terms contained in the expired contract. *Cf. Litton*, 501 U.S. at 207, 111 S.Ct. at 2225–26. As such, the continued observance by parties of certain terms of an expired contract may properly give rise to an inference that they intend to be bound by all of the terms of the expired agreement. *See* 2 *Corbin on Contracts* § 504, at 717 (1963) ("if the parties at the expiration of a written contract of employment continue as before without a new

express agreement, it will be inferred that the service and the compensation are the same as before"); 2 *Williston on Contracts* § 6.42, at 452 (4th ed. 1991) (same). Central to the rationality of this inference is the fact that nothing other than the parties' intentions bind them to act as they do.

But, postexpiration conduct in the context of collective-bargaining occurs within a very different legal paradigm. Under the unilateral change doctrine announced in *National Labor Relations Board v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), employers are prohibited from unilaterally changing the terms of an expired collective-bargaining agreement regarding certain mandatory subjects, such as wages, in the course of bargaining a new contract. The Court explained that an employer would have an unfair advantage in negotiating a new agreement where he could unilaterally alter such terms prior to bargaining. *Katz*, 369 U.S. at 744–47, 82 S.Ct. at 1112–13. *See also Litton*, 501 U.S. at 198, 111 S.Ct. at 2221. Because an employer is legally required to observe terms of the expired contract, it cannot be fairly said that his conduct constitutes an implicit agreement to those terms. *See International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 1199 v. Pepsi–Cola Gen. Bottlers, Inc.* ("*Pepsi–Cola*"), 958 F.2d 1331, 1336 (6th Cir.1992) (postexpiration compliance with provision governed by *Katz* only supports an inference that an employer wished to avoid violating the National Labor Relations Act). *See also Luden*, 28 F.3d at 364–65 (Alito, J. dissenting) (expressing doubt about validity of majority's inference in light of the unilateral change doctrine).

And so, *Luden* applies a recognized rule of contract interpretation to determine a party's intent with respect to postexpiration conduct, even though that party's postexpiration conduct may reflect nothing more than compliance with the unilateral change doctrine, as opposed to an intent to extend contract terms. This court respectfully declines to adopt the *Luden* approach.

### 2. *There is no implied-in-fact agreement to arbitrate*

Though this court declines to follow *Luden*, the question remains whether the Union

can establish that postexpiration conduct of AAB and the Union has given rise to an agreement to arbitrate postexpiration disputes. Because the existence of an implied-in-fact agreement is a question of fact, *Bushkin Assoc., Inc. v. Raytheon Co.*, 815 F.2d 142, 150–51 (1st Cir.1987), the issue for the court is whether it can reasonably be inferred from the operative facts that an agreement between AAB and the Union to arbitrate postexpiration agreements existed.

 An implied-in-fact agreement arises where the conduct of the parties, in light of the surrounding circumstances, indicates that the parties have reached a tacit understanding. *Hercules Inc. v. United States*, — U.S. —, —, 116 S.Ct. 981, 986, 134 L.Ed.2d 47 (1996). As the foregoing discussion of *Luden* demonstrates, the mere fact that an employer continues to adhere to the general terms of an expired collective-bargaining agreement is insufficient by itself to demonstrate that it has manifested assent to an obligation to arbitrate postexpiration disputes. To support an inference that an agreement to arbitrate has arisen, AAB's compliance with the terms of an expired agreement must be accompanied by other conduct supporting an inference that an agreement to arbitrate was reached. Moreover, there must not be other circumstances that would preclude the Union from possessing a reasonable expectation that an agreement had been created.

6. The Union does point to a fact indirectly implying an agreement to arbitrate, namely that AAB continued to observe the security and dues check-off provision. The Union contends that this manifested an intent to arbitrate postexpiration disputes because AAB was not required by the unilateral change doctrine to observe the securities and dues check-off provision of the 1991 Agreement. *See Litton*, 501 U.S. at 199, 111 S.Ct. at 2221 (security and dues check-off provisions not encompassed by unilateral change doctrine). Nonetheless, the court concludes that in light of the conduct directly related to the issue of arbitration, the observance by AAB of the security and dues check-off provision cannot support an inference that AAB assented to arbitration.

7. Even under *Luden*'s approach, the court concludes that this letter effectively served notice to the Union that AAB disavowed any obligation to submit postexpiration disputes to arbitration.

As an initial matter, the Union supplies no evidence of any affirmative act by AAB directly implying acceptance of an obligation to arbitrate.[6] Indeed, the undisputed evidence shows that AAB acted in a manner contrary to such an agreement. In submitting the Lite sticker grievance to arbitration, counsel for AAB wrote to the Union:

> [AAB]'s willingness to submit this issue to the arbitration procedure set forth in the now-expired labor agreement is not intended to constitute and should not be construed as agreement by [AAB] to submit other disputes to arbitration pursuant to the expired labor agreement. Such disputes, if any, will be considered by [AAB] and discussed with the Union on a case-by-case basis.

This letter plainly apprised the Union that AAB did not believe it was bound by an agreement to arbitrate and that it would only consider whether to consent to arbitration of future disputes on a case-by-case basis.[7] In light of the language of this letter, the Union could not have reasonably expected that AAB agreed to arbitrate future disputes.

Moreover, the Union's conduct belies any basis for it reasonably forming the belief that AAB had manifested its assent to arbitrate postexpiration disputes. A promise not to strike is the *quid pro quo* for an agreement to arbitrate. *Boy's Markets, Inc. v. Retail Clerks, Local 770*, 398 U.S. 235, 247–48, 90

Though the Union insists that it did not accede to AAB's characterization of its obligation to arbitrate postexpiration disputes, the Union's conduct is irrelevant to the effectiveness of AAB's repudiation. *See Luden*, 28 F.3d at 364 (implied-in-fact agreement terminated when "either party to the lapsed [collective-bargaining agreement] objectively manifest to the other a particularized intent"). Moreover, to the extent that the parties correspondence reflects a disagreement about the continuation of an obligation to arbitrate, such a disagreement is sufficient to extinguish an implied-in-fact agreement to arbitrate. *See Luden*, 28 F.3d at 356–57 ("In short, *the record does not reveal that the parties disagreed about the continuation of the arbitration procedure during the interim bargaining period in any meaningful way* or that both parties actually intended for the arbitration clause not to endure, *the occurrence of either of which would have excluded that term from the implied-in-fact [collective-bargaining agreement].*") (emphasis added).

S.Ct. 1583, 1590–91, 26 L.Ed.2d 199 (1970). Here, the Union's conduct exhibited an intention not to be bound by the 1991 Agreement's no-strike clause by (1) sending the Notice to Mediation Agencies for the purpose of enabling it to employ economic weapons against AAB, (2) refusing AAB's offer to extend the 1991 Agreement in order to maintain bargaining leverage, and (3) threatening to strike during negotiation.[8] *Cf. Luden,* 28 F.3d at 357 n. 16 (resort to strike would manifest intent to repudiate the arbitration provision of the implied-in-fact collective-bargaining agreement); *Pepsi–Cola,* 958 F.2d at 1335 (union's call for strike demonstrated that it did not believe implied agreement containing all the terms of the expired agreement existed).

Finally, the Union's conduct did not stop at threats. Since the expiration of the 1991 Agreement, the Union has deployed the economic weapon of a consumer boycott against AAB products. Such conduct further evidences that no agreement to arbitrate postexpiration disputes exists. *See Luden,* 28 F.3d at 357 (recognizing relationship between an employer's promise to arbitrate and a union declining to engage in consumer boycotts).

Accordingly, the court concludes that no reasonable trier-of-fact could infer the existence an implied-in-fact agreement between AAB and the Union to arbitrate postexpiration disputes.

## IV.

### *CONCLUSION*

For the reasons stated above, the Union's motion for summary judgment is DENIED

and AAB's motion for summary judgment is ALLOWED.

An order will issue.

---

**8.** Though maintaining that it may at any time engage in a strike, the Union suggests that the fact that it has not struck conferred a benefit on AAB in exchange for which it reasonably expected compensation in the form of a promise to arbitrate postexpiration disputes. The Union's contention is flawed. If, as the Union maintains, it can unilaterally decide to strike, then the obverse construction of that right is that AAB can unilaterally decline to arbitrate. *Cf. Litton,* 501 U.S. at 199, 111 S.Ct. at 2221–22 ("no-strike clauses" are excluded from the unilateral change doctrine, except to the extent other dispute resolution methods survive expiration of the agreement). It is the assurance not to strike that serves as consideration for an agreement to arbitrate. *Luden,* 28 F.3d at 357 n. 16 (*"quid pro quo* for arbitration clauses is typically a *promise* not to strike") (emphasis added). That the Union retained a unilateral power to strike simply belies the existence of an agreement.