**Troy W. MCNEALY, Plaintiff–Appellant,**

v.

**CATERPILLAR, INC., Defendant–Appellee.**

No. 97–1277.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1997.

Decided March 20, 1998.

Marsha S. Berzon (argued), Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for Plaintiff–Appellant.

Columbus R. Gangemi, Jr. (argued), Gerald C. Peterson, Joseph James Torres, Winston & Strawn, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, KANNE, and DIANE P. WOOD, Circuit Judges.

CUDAHY, Circuit Judge.

This appeal is a small piece of one of the most protracted disputes between labor and management in recent history. Appellant Troy McNealy, a former member of the United Auto Workers (UAW), brought suit alleging that appellee Caterpillar violated Illinois law when it dismissed him without just cause. The district judge held that a prior decision of the Illinois Appellate Court precluded McNealy from pursuing his suit, and, in the alternative, that the National Labor Relations Act (NLRA) preempted McNealy's state law claim. In this opinion, we hold that the decision of the Illinois court did not give rise to issue preclusion. We also find that McNealy and Caterpillar were not parties to an individual contract, and accordingly decline to reach whether the NLRA would preempt a state law claim based on breach of that contract. We conclude by suggesting that McNealy's claim would be more appropriately framed as a suit under § 301 of the NLRA.

I. Background

Troy McNealy was a production and maintenance employee at a Caterpillar plant from 1974 until he was involuntarily terminated in October 1992. In February 1991, McNealy went on short-term disability leave for foot surgery. Caterpillar extended this leave when McNealy manifested a form of epilepsy, and placed him on long-term disability leave in February 1992. But in October 1992, agents of Caterpillar saw McNealy driving an automobile. The company subsequently fired him for misrepresenting his medical condition. McNealy, who asserts that his illness does not prevent him from driving short distances, complained to his union, the UAW.

When Caterpillar fired McNealy, its employees were working without a formal collective bargaining agreement (CBA). That contract had expired in September 1991. Caterpillar and the UAW were unable to agree to the terms of a new CBA, and the UAW called a strike. After the UAW reject-ed three proposals by Caterpillar, the union and company had bargained to impasse. Eventually, Caterpillar notified the UAW that it would exercise its statutory right to unilaterally implement portions of its most recent contract proposal. On March 31, 1992, Caterpillar sent a letter to each UAW represented worker, including McNealy. The letter invited striking employees to return to work and summarized the unilaterally implemented terms.

The terms of the unilateral implementation provided that employees could be terminated only for just cause. However, the implementation did not include a means by which the just cause provision could be enforced. Caterpillar left intact the various steps of the grievance procedure antecedent to arbitration, but specifically disavowed the clause of the expired CBA under which Caterpillar had agreed to submit grievances to arbitration. The UAW filed a grievance with respect to McNealy's firing, but was unsuccessful in obtaining relief for him. And because Caterpillar had eliminated the arbitration clause, the UAW was unable to pursue the issue before an arbitrator.

McNealy decided to take the matter to federal district court. In June 1996, he filed suit alleging that Caterpillar's March 1992 letter constituted an individual contract with the company, that the contract protected his right not to be discharged without just cause and that Caterpillar had breached the contract under Illinois law. Caterpillar responded with a motion for judgment on the pleadings. In relevant part, the company argued that a prior decision of the Illinois Appellate Court precluded McNealy's suit, or, in the alternative, that the NLRA preempted McNealy's state law claim. The district court granted the motion on both grounds.

II. Issue Preclusion

■ We begin by explaining why we disagree with the district court's conclusion that *Young v. Caterpillar, Inc.*, 258 Ill.App.3d 792, 196 Ill.Dec. 285, 629 N.E.2d 830 (1994), precluded McNealy from pursuing his state law claim. In *Young*, the plaintiffs filed a class action alleging a breach of contract under Illinois law. Caterpillar's March 1992 letter

stated that the company was "inviting all hourly employees to return to work beginning on Monday, April 6, 1992." When the plaintiffs agreed to return, Caterpillar reinstated them over a one-month period. *See Young,* 196 Ill.Dec. 285, 629 N.E.2d at 831–32. The plaintiffs alleged that, by virtue of the March 1992 letter, Caterpillar entered into individual contracts with each of its employees, and that the delay in reinstatement breached these contracts. *See id.* at 288, 629 N.E.2d at 833. The Illinois court assumed the existence of an individual contract, but found that federal law preempted the state law claim. *See id.* at 288–89, 629 N.E.2d at 833–34. The court explained that "the conduct complained of by the plaintiffs involves the manner in which they were reinstated following the conclusion of their strike. . . . These claims are in essence unfair labor practice claims under section 8 of the [NLRA]." *Id.* at 288, 629 N.E.2d at 833. Accordingly, the Illinois court found that the plaintiffs' claims were within the exclusive jurisdiction of the National Labor Relations Board (NLRB). *See id.* at 289, 629 N.E.2d at 834.

 In general terms, issue preclusion limits the litigation of issues that have been decided in a previous action. Whether a judgment of a state court results in issue preclusion depends upon the law of that state. *See Rekhi v. Wildwood Indus., Inc.,* 61 F.3d 1313, 1317 (7th Cir.1995). While Illinois courts are divided on the issue, in earlier cases we have determined that Illinois applies issue preclusion to questions of law. *See id.* (collecting cases). Thus, if the elements necessary for issue preclusion are present, McNealy would be estopped from litigating whether federal law preempts his state law claim; instead he would be bound by the decision in *Young.* Under Illinois law, issue preclusion exists if: (1) the issue decided in the previous action is identical to that allegedly barred in the present action; (2) the prior action resulted in a final judgment on the merits; and (3) the party against whom estoppel is being asserted was either a party in the prior action or in privity with a party. *See Progressive Land Developers, Inc. v. Exchange Nat. Bank of Chicago,* 266 Ill.App.3d 934, 204 Ill.Dec. 384, 392, 641

N.E.2d 608, 616 (1994). These are the criteria we must examine to determine whether *Young* precluded McNealy from pursuing his claim.

Although there is some basis for preclusion, we find neither an identity of interests nor privity between the parties. With respect to the former, although both McNealy and the *Young* plaintiffs argued that the March 1992 letter constituted a contract with individual employees, there nonetheless is not an identity of interests. The *Young* plaintiffs litigated the issue whether federal labor law preempted a state law breach of contract claim stemming from Caterpillar's failure to promptly reinstate its employees. And this was the only question on which the Illinois Appellate Court ruled. *See Young,* 196 Ill.Dec. 285, 629 N.E.2d at 833 ("In sum, we find the plaintiffs' attempt to . . . dress their reinstatement claims in the guise of state law contract claims unavailing."); *id.* at 288–89, 629 N.E.2d at 833–34 ("Even assuming the plaintiffs could make a state law breach of contract claim arising out of the defendant's failure to immediately reinstate[ ] them at the conclusion of the strike, we find such a claim pre-empted."). McNealy, however, seeks to litigate whether federal law preempts his claim that Caterpillar dismissed him without just cause. Because this is a different issue than the one raised in *Young,* McNealy cannot be said to have an identity of interests with the *Young* plaintiffs.

 For a closely related reason, McNealy is not in privity with the *Young* plaintiffs. Under Illinois law, a party is in privity with another "if his own interests [are] so closely aligned to [the prior] party's interests that the party was his virtual representative." *Progressive Land,* 204 Ill.Dec. at 392, 641 N.E.2d at 616. Because the *Young* plaintiffs litigated over reinstatement rights, not dismissal without just cause, they cannot be described as McNealy's virtual representative. *See People Who Care v. Rockford Bd. of Educ.,* 68 F.3d 172, 177 (7th Cir.1995). In the absence of identity of interests and privity, *Young* cannot preclude McNealy from

pursuing his state law claim against Caterpillar.

## III. Individual Contracts

 But McNealy is not out of the woods yet. His state law claim is premised on the notion that the March 1992 letter was the foundation of an individual contract between McNealy and Caterpillar. In the district court, Caterpillar proffered an alternative basis for dismissing McNealy's complaint: that *Young* notwithstanding, "the NLRA preempts [McNealy's] claim that Caterpillar's unilateral implementation of terms ... created an individual employment contract governed by state law." Def.'s Mem. in Supp. of J. on Pleadings at 5. The district court agreed and held that the NLRA preempted McNealy's state law claim under the doctrines set forth in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).[1]

We too deny McNealy's state law claim, for a reason similar to the one articulated by the district court. We take issue with the underpinning of McNealy's state law claim— that by virtue of its March 1992 letter, Caterpillar and McNealy entered into an individual contract. In the district court and on appeal, the parties argued whether federal labor law prohibits an employer from entering into individual contracts with its union-represented employees. While the district judge never explicitly stated that federal labor law prohibited Caterpillar from entering into individual contracts, he apparently believed that the existence of such contracts was dubious. In deciding that the *Garmon* doctrine preempted any state law claim, the district court reasoned that if Caterpillar had entered into an individual contract, it arguably had committed an unfair labor practice given its ongoing obligation to the collective bargaining process. *See* Mem. Op. at 19. Hence the district judge ruled that an individual contract could not be enforced under state law because enforcement would conflict with the purposes of the federal labor scheme. We arrive at a similar conclusion: within the constraints of the federal labor scheme, an individual contract cannot even arise under the circumstances prevailing here.[2]

 McNealy argues that the mere fact of impasse opens the door to individual contracts. This is incorrect. While the Supreme Court has "reserve[d] a field for the individual contract, even in industries covered by the National Labor Relations Act," *J.I. Case Co. v. NLRB*, 321 U.S. 332, 336, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944), it has not permitted such contracts when they would be detrimental to the collective bargaining process. *See id.* at 337, 64 S.Ct. at 580; *see also* Richard A. Bales, *The Discord Between Collective Bargaining and Individual Employment Rights: Theoretical Origins and a Proposed Solution*, 77 B.U. L.Rev. 687, 712 n. 147 (1997) (explaining when individual contracts are permissible). Collective bargaining is "built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees ... have the most effective means of bargaining for improvements...." *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006–07, 18 L.Ed.2d 1123 (1967); *see also* id. ("[National labor] policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees."). It is axiomatic that a company and its employees undermine the collective bargaining process when they bypass the union and negotiate

---

1. In general terms, the *Garmon* doctrine preempts state regulation of conduct that is protected by § 7 of the NLRA, or prohibited by § 8 of the NLRA. *See Garmon*, 359 U.S. at 244–45, 79 S.Ct. at 779–80. The *Machinists* doctrine similarly preempts state regulation of the economic weapons that Congress intended to leave available to unions and employers. *See Machinists*, 427 U.S. at 149–51, 96 S.Ct. at 2557–58.

2. Accordingly, we do not make any specific finding on the merits of the preemption question. Because no individual contract exists, we do not have to explore whether the *Garmon* and *Machinists* doctrines would preempt a state law claim arising out of the contract.

individual agreements during impasse. *See Beaman v. Yakima Valley Disposal, Inc.*, 116 Wash.2d 697, 807 P.2d 849, 854 (1991) ("It is difficult to imagine an action more disparaging to the collective bargaining process than an employer entering into new individual employment contracts with employees during an impasse."). Hence while an impasse in bargaining permits a company to unilaterally implement the terms of its prior proposal to the union, it does "not entitle the company to disregard the union and bargain individually with the employees." *Szabo v. U.S. Marine Corp.*, 819 F.2d 714, 718 (7th Cir.1987); *see Brown v. Pro Football, Inc.*, 518 U.S. 231, 237–39, 116 S.Ct. 2116, 2121, 135 L.Ed.2d 521 (1996) ("[I]mpasse and an accompanying implementation of proposals constitute an integral part of the bargaining process."); *id.* at 244, 116 S.Ct. at 2124 ("Employers, however, are not completely free at impasse to act independently. The multiemployer bargaining unit ordinarily remains intact; individual employers cannot withdraw. The duty to bargain survives; employers must stand ready to resume collective bargaining.") (citations omitted). Some subsequent event or circumstance may so impair the collective bargaining relationship as to admit of individual contracts; but no such event or circumstance is shown, or even argued, here. Because Caterpillar's unilateral implementation was not the death knell of the collective bargaining process, Caterpillar and McNealy were not free to enter into an individual contract.

In his appellate brief, McNealy urges us to view Caterpillar's March 1992 letter as the basis for an individual contract because, among other reasons, "it is the individual employees ... who engage in the conduct that constitutes implicit acceptance [and] continuation of the employment relationship."

Appellant's Br. at 30 n. 8. But we think that McNealy is disregarding the role the UAW played after negotiations were at an impasse. Caterpillar employees only began to work under the unilaterally implemented terms after the UAW instructed them to do so. After Caterpillar mailed its March 1992 letter, the UAW initially expanded the strike to additional Caterpillar facilities and filed unfair labor practices with the NLRB.[3] On April 14, 1992, the UAW recessed the strike and made an unconditional offer to return on behalf of its members. Strikers began to return to work on April 20. *See* Def.'s Mem. in Supp. of J. on Pleadings at 3; *Young*, 196 Ill.Dec. at 287–88, 629 N.E.2d at 832–33. In some respects, this scenario resembles what occurs when the representatives of the employer and union sign on a dotted line and enter into a formal CBA. While the union attends to the legal niceties, it is the individual employees who arrive at the plant each day and otherwise engage in the sort of conduct that indicates continuation of the employment relationship. But although the individual acts in accordance with the CBA, it is not an individual employment contract. *See J.I. Case*, 321 U.S. at 335, 64 S.Ct. at 579. Rather, the CBA is an accord between the union and the employer with respect to the terms that will govern the employment relationship. *See id.* at 334, 64 S.Ct. at 578–79. In sum, then, Caterpillar's unilateral implementation of terms did not diminish or nullify the role of the UAW. Not only did the UAW continue as the certified bargaining agent, acknowledged as such by Caterpillar, but active contract negotiations have always been a substantial possibility.[4] Because McNealy was represented by a union, and has not shown an event or circumstance that dramatically impaired the collective bargaining process, he was not able to enter into a contract

3. These charges were withdrawn after the regional director of the NLRB determined that there was insufficient evidence to issue a complaint.

4. The record does not specifically disclose continuing negotiations after impasse, but we may judicially notice press accounts that the UAW and Caterpillar recently negotiated a tentative contract, which was later rejected by rank-and-file union members. *See, e.g.,* Stephan Braun, *Caterpillar's UAW Rift Down to Nameless 50*, L.A.

Times, Mar. 2, 1998 at A1; Frank Swododa, *Caterpillar, UAW at a Crossroads; Rank & File's Rejection of Deal Imperils Both Sides,* The Wash. Post, Feb. 24, 1998 at D3; Stephan Franklin, *Caterpillar, UAW Reach a Compromise,* Chi. Trib., Feb. 14, 1998 at N1. For purposes of deciding whether individual contracts are possible, however, it is enough to recognize that there has been a substantial potential for active collective bargaining.

with Caterpillar that governed the terms and conditions of his employment.

## IV. Disavowal of the Arbitration Clause

■ Perhaps our opinion could end here. The UAW and Caterpillar failed to negotiate a formal collective bargaining agreement. We have determined that McNealy does not have an individual contract. And Caterpillar, in its March 1992 letter, expressly stated that it would not submit grievances to arbitration. Thus it would seem that McNealy has no remedy, if indeed he was dismissed without just cause. But McNealy's brief raises the possibility of a remedy that is based on an implied agreement between Caterpillar and the UAW. This is a possibility we must explore; if the just cause provision is to be meaningful, leaving McNealy without a remedy would be unsatisfactory and violative of the intent of the federal labor laws.

■ We begin by noting that Caterpillar disavowed the arbitration clause. The NLRA mandates that the employer and union bargain over an arrangement for the arbitration of disputes, just as they must bargain over many other terms of employment. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 199, 111 S.Ct. 2215, 2221–22, 115 L.Ed.2d 177 (1991). With regard to most mandatory subjects of bargaining, the employer commits an unfair labor practice if it changes the terms of an expired CBA without first bargaining to impasse. *See* 29 U.S.C. § 158(a)(5). But arbitration clauses are not subject to this prohibition on unilateral change. *See Litton*, 501 U.S. at 201, 111 S.Ct. at 2222–23. Stated differently, unlike most subjects of mandatory bargaining, an arbitration clause is not effective after a CBA expires, unless the parties agree to continue the clause. To explain why arbitration clauses do not survive the expiration of a CBA, the Court has emphasized that arbitration is "a creature of the collective bargaining agreement," *id.* at 204, 111 S.Ct. at 2224 (quoting *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 250–51, 97 S.Ct. 1067, 1071–72, 51 L.Ed.2d 300 (1977)), and that excluding arbitration clauses from the prohibition against unilateral change is consistent with the principle that "[t]he law compels a party to submit his grievance to arbitration only if he has contracted to do so." *See id.* at 200, 111 S.Ct. at 2222 (quoting *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974)). This, however, merely restates the sine qua non of contract law—that parties are not bound by obligations unless they agreed to the obligations. But with respect to most mandatory subjects of bargaining, federal labor law routinely disregards this basic proposition by mandating that the parties maintain the status quo for a period of time after the contract expires. The reasons why arbitration clauses are treated differently have been the subject of considerable speculation.

At least one commentator understands the Court's treatment of arbitration to reflect more "than the tautological proposition that a contract duty does not exist without a contractual basis to support it." Joseph Weeks, *Continuing Liability Under Expired Collective Bargaining Agreements: Parts II & III*, 15 Okla. City U.L.Rev. 359, 379 (1990). Professor Weeks explains:

> [T]he Court has gone to some lengths in a variety of contexts to make the point that the due process clause of the fifth and fourteenth amendments requires at a minimum the utilization of some form of judicial involvement before a party may be compelled by law to respond in damages to an asserted breach of contract. With respect to the NLRA, Congress in the Taft–Hartley amendments provided in section 301 for federal court jurisdiction to facilitate the judicial resolution of claims that a collective agreement has been breached and expressly rejected efforts to impose a regime of compulsory arbitration. Seen in this light, the Court's insistence that a duty to arbitrate cannot be imposed by law reflects not simply the truism that a contractual obligation must be supported by a contractual obligation, but rather that in the absence of a contractual obligation to arbitrate a party to a contract has a statutory and constitutional right to a judicial resolution of claims that it has been breached.

*Id.* at 379–80, 94 S.Ct. at 637–38 (footnotes omitted). This suggests, then, that in the absence of arbitration, the Court assumes a party will be able to avail itself of the judicial process. But seemingly McNealy is not in an either-or situation. The terms of the unilateral implementation do not allow for the possibility that an arbitrator may determine whether employees were dismissed for cause. And, without an individual contract, McNealy seemingly lacks the basis for a breach of contract claim that could be litigated in a judicial forum. Hence our opinion, to this point at least, has condemned McNealy to a sort of legal limbo.

McNealy's moribund status is particularly troubling given the nature of his claim. As a practical matter, one can question whether a just cause provision has any reality when the employee is deprived of neutral review of the firing decision. The textbook response to this concern might be to argue that in fact McNealy is *not* remediless. A no strike clause—the quid pro quo for an arbitration clause—is also excluded from the prohibition on unilateral change. *See Litton,* 501 U.S. at 199, 111 S.Ct. at 2221–22. When Caterpillar refused to reinstate McNealy, the UAW, which processed his grievance, could have drawn its economic saber and called a strike, or at least brandished that possibility. But while we cannot suppose that a union will *never* strike because it believes an employee has been dismissed without cause, *see Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 97, 82 S.Ct. 571, 573, 7 L.Ed.2d 593 (1962) (union called an eight-day strike after a worker allegedly was fired without cause), we believe such a call to arms is unlikely. When compared to other provisions of a CBA, the right not to be terminated without just cause is uniquely individual; the circumstances in which the clause will be invoked vary from one employee to the next. Thus a just cause provision sharply contrasts, for example, with a wage schedule, which has a broad impact on the collective. Accordingly, discrete violations of the just cause provision are unlikely to rally the collective to action.

Finally, we offer a word or two about the larger context of this appeal. Caterpillar's employees have worked without a formal collective bargaining agreement since 1991 and have twice gone on strike. The UAW remains certified, and is able to and does in fact negotiate with Caterpillar. But it may be that no formal agreement is on the immediate horizon.[5] We may assume that this stalemate represents a fine equilibrium between the opportunities for economic leverage that federal labor law confers upon employees and management, respectively. *See United Paperworkers Int'l Union, Local 274 v. Champion Int'l Corp.,* 81 F.3d 798, 802 (8th Cir.1996). No doubt it will be argued here that leaving McNealy and the UAW without a remedy for a just cause violation was intended by Congress to provide Caterpillar with leverage to force the UAW to agree to a contract. *Cf. Machinists,* 427 U.S. at 140, 96 S.Ct. at 2553 ("[T]he crucial inquiry [is] whether Congress intended that the conduct involved be unregulated because [it should] be controlled by the free play of economic forces.") (citations and internal quotation marks omitted). In the case of the just cause provision, where the individual impact is severe and the collective impact slight, we think that a leverage analysis causes the tail to wag the dog. In the first place, a just cause provision without a reasonable means of enforcement may be illusory. Second, such an individual injustice seems to provide slight leverage for a general settlement. The stalemate has continued for seven years apparently undisturbed by claimed just cause violations. We doubt that providing a remedy short of a strike for such a violation would materially disturb the balance of bargaining power. *But see Champion,* 81 F.3d at 802.

## V. Implied-in-Fact Collective Bargaining Agreements

■ For these reasons, we avail ourselves of an approach raised in McNealy's brief and foreshadowed by our discussion of the UAW's response to the March 1992 unilateral implementation. As we will elaborate, we would construe Caterpillar's unilateral implementation, and the UAW's response to it, as an interim implied-in-fact

---

**5.** See articles cited in note 4, *supra.*

CBA that incorporated a just cause provision. But before we discuss how we arrive at such a result, it is appropriate to explain the significance of an interim CBA. When a litigant's claim depends on an analysis of the terms of a CBA, suit may be brought under § 301 of the NLRA. That section provides a federal forum "for violations of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). Section 301 is not just limited to formal CBAs. Instead, it encompasses any "agreement between employers and labor organizations significant to the maintenance of labor peace between them." *Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods,* 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962). Thus § 301, and the body of federal law that the courts have fashioned under it, apply to implied-in-fact CBAs. *See Champion,* 81 F.3d at 802; *Luden's Inc. v. Local Union No. 6 of the Bakery Workers' Int'l Union,* 28 F.3d 347, 355 n. 12 (3d Cir. 1994) ("Of course, an implied-in-fact CBA suffices to confer jurisdiction under § 301 because it preserves and advances the statutory objectives of labor peace and stability."). McNealy's claim, which alleges that he was dismissed without just cause, would require a court to interpret the terms of the implied interim agreement between Caterpillar and the UAW. *See, e.g., Hanks v. General Motors Corp.,* 859 F.2d 67, 70 (8th Cir.1988) (finding § 301 preempted an employee's state law claim for wrongful discharge). Hence § 301 may provide McNealy with an avenue of relief.

The notion of an implied-in-fact CBA has a significant history. We have already recognized that "conduct manifesting an intention to abide and be bound by the terms of an agreement" suffices to support a finding of a CBA. *Capitol–Husting Co. v. NLRB,* 671

F.2d 237, 243 (7th Cir.1982); *see Atchley v. Heritage Cable Vision Assocs.,* 101 F.3d 495, 500 n. 2 (7th Cir.1996). We have also stated that the "crucial inquiry is whether the two sides have reached an 'agreement,' even though that 'agreement' might fall short of the technical requirements of an accepted contract." *Capitol–Husting,* 671 F.2d at 242 (citing *NLRB v. Donkin's Inn,* Inc., 532 F.2d 138, 141 (9th Cir.1976)). This circuit has not, however, resolved whether a unilateral implementation can give rise to an implied-in-fact CBA,[6] much less an implied-in-fact CBA that incorporates a just cause provision. We shall now address these two questions.

We first consider whether Caterpillar's unilateral implementation resulted in an implied-in-fact CBA. This question requires us to jump two hurdles, but neither is insurmountable. The first is whether Caterpillar, by virtue of its implementation, can be understood as making an offer to the UAW. In the strictest sense of the word, Caterpillar did not "choose" which terms to implement. Under federal law, Caterpillar could not tinker with the status quo unless it had presented the change at the bargaining table, or the change affected a non-mandatory subject of bargaining or a mandatory subject of bargaining that did not survive the expiration of the CBA. *See Litton,* 501 U.S. at 198–99, 111 S.Ct. at 2221–22. When described in this manner, Caterpillar's implementation represents nothing more than compliance with federal law. For this reason, some courts have declined to construe unilateral implementations as offers. *See International Union, United Mine Workers of Am. v. Big Horn Coal Co.,* 916 F.2d 1499, 1501, 1502 (10th Cir.1990); *Teamsters Local Union No. 122 v. August A. Busch & Co. of Mass., Inc.,* 932 F.Supp. 374, 380 (D.Mass.1996); *see also UAW, Local 33 v. R. E. Dietz Co.,* 996 F.2d 592, 595 (2d Cir.1993) ("Because the alleged

**6.** In *Chicago Typographical Union v. Chicago Sun–Times, Inc.,* 935 F.2d 1501, 1510 (7th Cir. 1991), we speculated whether a unilateral implementation might commit the parties to arbitration: "An implemented final offer is not contractual; it is unilateral; the whole point is that the employer is implementing an offer that the union has not accepted. On the other hand, the union might accept the offer, arbitration clause and all, by conduct rather than by express words...."

We also noted that we had decisions supporting both positions. *Compare Local 106, Serv. Employees Int'l Union v. Homewood Mem'l Gardens, Inc.,* 838 F.2d 958 (suggesting that lapsed CBA does not give rise to contractual obligations) *with United Paperworkers Int'l Union v. Wells Badger Indus., Inc.,* 835 F.2d 701, 703 (7th Cir.1987) (suggesting that a unilateral implementation may result in such obligations).

post-expiration contract in this case is founded on a letter from Dietz to its employees [that recites Dietz's intent to honor its obligations under the NLRA], it is not the type of contract covered by § 301."); *cf. Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 27 (2d Cir.1988) (explaining that, in a case where the parties had not yet bargained to impasse, "the CBA must be considered defunct upon its expiration for all purposes except definition of the status quo").

But we do not perceive Caterpillar as a mere puppet acting out a role prescribed by federal law. Accordingly, we align ourselves with those courts that have found that a unilateral implementation can constitute an offer. *See Champion*, 81 F.3d at 803; *United Paperworkers Int'l Union v. International Paper Co.*, 920 F.2d 852, 856 (11th Cir. 1991); *Cumberland Typographical Union v. The Times and Alleganian Co.*, 943 F.2d 401, 405 (4th Cir.1991); *Moreno v. Los Angeles Child Care & Dev. Council, Inc.*, 963 F.Supp. 876, 879–80 (C.D.Cal.1997) ("The Court finds the actions of defendant and the union [after unilateral implementation] sufficient to conclude that an implied-in-fact labor contract existed providing that defendant's employees could only be terminated for just cause."); *see also Luden's*, 28 F.3d at 358 ("In this result we find ourselves sharing company with many courts of appeals who have concluded that a union may (impliedly) accept a 'unilateral offer' made when an employer implements its final offer after reaching a bargaining impasse by the ordinary act of entering the employer's open doors, a view with which we now concur."). The unilateral implementation here incorporated terms of employment that Caterpillar proposed and advocated during negotiations with the UAW. In this sense, then, Caterpillar had more than a modicum of control over the terms it

eventually implemented. Moreover, federal labor law did not require Caterpillar to unilaterally implement its prior proposal and invite employees to return to work. The company was free to cease operations and lock out its employees until it had hammered out a formal agreement with the UAW. *See Brown*, at 241–43, 116 S.Ct. at 2123. The fact that the choice of this option seems unlikely does not render Caterpillar's decision to invite the employees back to work any less voluntary. *See United Paperworkers*, 920 F.2d at 856 ("By implementing that modified offer, the Company was in effect stating the conditions of employment under which the Union's members would work, should they choose to do so, until a long-term agreement was reached."); *see also Luden's*, 28 F.3d at 357 ("Throughout the relevant period, Luden's reaped benefits from its union employees' loyal service, and now it must accept the consequences."). Hence we understand Caterpillar, through its unilateral implementation, as having made an offer for an interim agreement to the UAW.[7]

Next we leap the second hurdle and decide whether the UAW accepted Caterpillar's interim offer. This inquiry admittedly has an Alice–in–Wonderland quality; Caterpillar, after all, implemented the same proposal that the UAW *rejected* at the bargaining table. But this does not preclude a finding of acceptance. Like the Eleventh Circuit, "[w]e have no conceptual difficulty in understanding that an employment arrangement that was unacceptable as a permanent, formal agreement might still be acceptable as a temporary, stop-gap measure." *United Paperworkers*, 920 F.2d at 857. Thus we think that when the UAW recessed the strike and its members returned to work, the union accepted Caterpillar's interim offer.[8]

---

7. We also note that after the employees returned to work, Caterpillar proceeded as if it were operating under a CBA. To illustrate, Caterpillar heard grievances about alleged violations of the unilaterally implemented terms. As we have explained in previous cases, a grievance procedure means that "complaints about violations of the contract are made in the first instance to union representatives who ... will then try to resolve it by discussion with management.... A 'grievance' in such a setting is simply a complaint that

the collective bargaining contract has been violated." *Szabo*, 819 F.2d at 719–20.

8. When a unilateral implementation is the foundation for an implied-in-fact CBA, the Eighth Circuit requires proof of acceptance "over and above the fact that the union members continued to work." *Champion*, 81 F.3d at 803. Further, the proof must "relate to the union-employer bargaining relationship." *Id*. McNealy's appeal does not require us to decide if we concur with our sister circuit. Here the UAW members did

These perceptions of offer and acceptance allow us to conclude that an implied-in-fact interim CBA existed between the parties. The next issue is whether this CBA incorporated a just cause provision. We have already suggested that such a clause is a good candidate for inclusion in an implied-in-fact CBA, both because the clause connotes the right to neutral review of a firing decision and because a union is unlikely to strike over its breach. We also have little doubt that Caterpillar's implementation provided that an employee would not be fired without just cause. The March 1992 letter summarized several changes and then explained, "all other terms of employment remain the same at this time." The expired 1988–1991 CBA included a just cause provision. Because Caterpillar did not propose any changes to the provision during negotiations, federal law precluded Caterpillar from unilaterally altering it. But while all of this is significant, it is not enough to allow us to conclude that the implied-in-fact CBA incorporated a just cause clause. The Third Circuit has suggested that courts should not construe implied-in-fact CBAs as incorporating provisions when the result may conflict with federal labor policy. *See Luden's*, 28 F.3d at 359. Because an implied-in-fact CBA is a gateway to § 301 jurisdiction, and because we do not want to reach a result that runs contrary to congressional intent, we next inquire whether federal labor policy sanctions the inclusion of a just cause provision.

■ We believe that federal labor policy encourages the recognition of an implied-in-fact CBA that provides an employee may not be terminated without just cause. First, federal law recognizes that CBAs foster peaceful labor relations, and thus encourages courts to liberally apply contract law as a means of lessening strife and encouraging congenial relations between unions and companies. *See id.* at 358. Hence, "[a]s a general matter, implied-in-fact CBAs are com-

patible with federal labor law and advance the goals of federal labor policy." *See id.* But second, and more specifically, *Luden's* cautions that federal labor policy may not condone implied-in-fact CBAs that would lead to the federal courts infringing on the NLRB's primary jurisdiction over suits that implicate unfair labor practices. *See id.* at 362. While federal courts and the NLRB have concurrent jurisdiction over breaches of CBAs that amount to unfair labor practices, *see Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), the Board has special expertise in the interpretation and application of the NLRA. Therefore, the issue here is whether a firing without just cause may be the subject of an unfair labor practice charge. For when the inclusion of a specific term in an implied-in-fact CBA gives rise to a § 301 suit that may also be framed as an unfair labor practice charge and brought before the NLRB, federal labor policy may counsel against inclusion. *See Luden's*, 28 F.3d at 362. However, this is not the situation that we confront. Simply stated, the NLRB does not have jurisdiction over a suit that, like McNealy's, alleges that an employee was discharged without cause. *See Capitol City Lumber Co. v. NLRB*, 721 F.2d 546, 549 (6th Cir.1983); *see also Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.*, 348 U.S. 437, 443 n. 2, 75 S.Ct. 489, 492 n. 2, 99 L.Ed. 510 (1955) ("breach of contract is not an 'unfair labor practice'"). Because the NLRB could not hear McNealy's suit, we do not infringe on its jurisdiction by construing the implied-in-fact interim CBA between Caterpillar and the UAW to incorporate a just cause provision.

However, and here there are major questions, McNealy did not invoke § 301 when he was before the district court. But, believing that we might favor this approach, his appellate brief includes a request that we remand so that he can amend his complaint to reflect

---

more than continue to work—they suspended a strike that had lasted over 160 days. We have no doubt that such an action went to the bargaining relationship between the UAW and Caterpillar.

We also do not express an opinion as to whether the UAW's second strike, which began almost two years after McNealy was terminated, consti-

tuted rejection of Caterpillar's offer. *See Big Horn*, 916 F.2d at 1502 ("[T]he commencement of a seven-month strike [three months after the unilateral implementation] ... shows continued dissatisfaction with and rejection of the employer's offer.").

a breach of an implied-in-fact interim agreement between the UAW and Caterpillar. There is, of course, a question whether a remand could accomplish what McNealy seeks. Among other things, § 301 provides a remedy to the union, not to an employee. When an employee seeks to bring a § 301 suit against his employer, he must allege a hybrid cause of action—first a claim of breach of fair representation against the union and then a § 301 cause of action against the employer. *See DelCostello v. Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983). We are not presently aware of facts suggesting a breach of fair representation by the UAW. In addition, a § 301 suit may be time-barred *See* id. at 172, 103 S.Ct. at 2294–95. But under the circumstances, we think it best to leave the resolution of these issues to the able district judge. Accordingly, the judgment is Vacated and the case Remanded for proceedings not inconsistent with this opinion.