Opinion by Judge FISHER; Dissent by Judge BEEZER.
FISHER, Circuit Judge.
The question before us is whether a state’s exercise of its sovereign power to control the use of its funds conflicts with national labor policy as expressed in the National Labor Relations Act (“NLRA”), 29 U.S.C. §§ 151-169. Specifically, two provisions in a California statute forbid employers who receive state grant or program funds in excess of $10,000 from using those funds to assist, promote or deter union organizing. We hold that California’s grant and program fund restrictions do not undermine federal labor policy, are not pre-empted by the NLRA and do not violate the First Amendment.
FACTUAL BACKGROUND
On September 28, 2000, California enacted Assembly Bill No. 1889, Cal. Gov’t Code §§ 16645-16649 (collectively, “AB 1889”). The preamble of the statute declares:
It is the policy of the state not to interfere with an employee’s choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing. It is the intent of the Legislature in enacting this act to prohibit an employer from using state funds and facilities for the purpose of influencing employees to support or oppose unionization and to prohibit an employer from seeking to influence employees to support or oppose unionization while those employees are performing work on a state contract.
§ 16645, Historical and Statutory Notes, Section 1 of Stats.2000, c. 872.
Two provisions of the California statute, sections 16645.2 and 16645.7, are at issue in this appeal.[1] Section 16645.2(a) bars private employers who are “recipients] of a grant of state funds” from “us[ing] the funds to assist, promote, or deter union organizing.” Section 16645.7(a) bars “[a] private employer receiving state funds in excess of [$10,000] in any calendar year on account of its participation in a state program” from using program funds “to assist, promote, or deter union organizing.” The phrase “assist, promote, or deter union organizing” includes “any attempt by an employer to influence the decision of its employees in this state or those of its subcontractors regarding ... [w]hether to support or oppose a labor organization that represents or seeks to represent those employees .... [or][w]hether to become a member of any labor organization.” § 16645(a)(l)-(2). The statute specifies as prohibited “any expense, including legal and consulting fees and salaries of supervisors and employees, incurred for research for, or preparation, planning, or coordination of, or carrying out, an activity to assist, promote, or deter union organizing.” § 16646(a). Expressly exempted from the statute’s reach are “activities] performed” or “expense[s] incurred” in connection with “[a]ddressing a grievance or negotiating or administering a collective bargaining agreement” and “[negotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization.” § 16647(a), (d).
The statute requires employers covered by sections 16645.2 or 16645.7 to certify *1081 that no state funds will be used to assist, promote or deter union organizing. §§ 16645.2(c), 16645.7(b). It also requires employers who make expenditures to assist, promote or deter union organizing to maintain and provide upon request “records sufficient to show that state funds have not been used for those expenditures.” §§ 16645.2(c), 16645.7(c).[2] If an employer commingles state and other funds, the statute presumes that any expenditures to assist, promote or deter union organizing derive in part from state funds. § 16646(b).
Employers who violate sections 16645.2 or 16645.7 are subject to fines and penalties, which include the disgorgement of the state funds used for the prohibited purposes and a civil penalty paid to the state that is equal to twice the amount of those funds. §§ 16645.2(d), 16645.7(d). Suspected violators may be sued by the state Attorney General or by any private taxpayer. § 16645.8(a)-(e). Prevailing plaintiffs, and prevailing taxpayer intervenors who make substantial contributions to an action under this section, are “entitled to recover reasonable attorney’s fees and costs.”[3] § 16645.8(d).
In April 2002, plaintiffs-appellees (collectively, the “Chamber of Commerce”) brought an action for injunctive and declaratory relief challenging the statute facially on numerous grounds, including NLRA preemption. The AFL-CIO and others (collectively, the “AFL-CIO”) intervened. In May 2002, the Chamber of Commerce moved for summary judgment. Defendants, who are the California Department of Health Services and state officials sued in their official capacity (collectively, “California”), filed cross motions for summary judgment in August 2002.
On September 16, 2002, the district court granted partial summary judgment in favor of the Chamber of Commerce. The district court determined that the NLRA preempted sections 16645.2 and 16645.7 under the Supreme Court’s Machinists doctrine because the provisions “regulate[d] employer speech about union organizing under specified circumstances, even though Congress intended free debate.” Chamber of Commerce v. Lockyer, 225 F.Supp.2d 1199, 1205 (C.D.Cal.2002); *1082 see Lodge 76, Int’l Ass’n of Machinists v. Wisc. Employment Relations Comm’n, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). The district court entered judgment in January 2003 and issued an injunction prohibiting California and the AEL-CIO from taking any actions to enforce sections 16645.2 and 16645.7 against any employer subject to the NLRA. California and the AFL-CIO appealed.
A three-judge panel of our court affirmed the district court, but the panel then withdrew its opinion upon the grant of appellants’ petition for panel rehearing. Chamber of Commerce v. Lockyer, 364 F.3d 1154 (9th Cir.2004), withdrawn and reh’g granted, 408 F.3d 590 (9th Cir.2005). On rehearing, a divided panel issued a second opinion, Chamber of Commerce v. Lockyer, 422 F.3d 973 (9th Cir.2005), which was in turn vacated and withdrawn from publication for reconsideration en banc. See Chamber of Commerce v. Lockyer, 435 F.3d 999 (9th Cir.2006); Chamber of Commerce v. Lockyer, 437 F.3d 890 (9th Cir.2006). We now reverse the district court’s judgment that the NLRA preempts the California statute and vacate the court’s injunctive order.
STANDARD OF REVIEW
We review de novo a district court’s grant of summary judgment and preemption analysis. See Winterrowd v. Am. Gen. Annuity Ins. Co., 321 F.3d 933, 937 (9th Cir.2003); Ting v. AT & T, 319 F.3d 1126, 1135 (9th Cir.2003). “A facial challenge to a legislative Act is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (internal quotation marks and citation omitted).
DISCUSSION
I. Market Participant Exception
Before addressing the merits of the preemption issue, we must first decide whether California’s condition on the use of its funds constitutes “regulation.” “A prerequisite to pre-emption [under the NLRA] is a finding that the state or local action in question constitutes regulation of labor relations between employers and employees.” Alameda Newspapers, Inc. v. City of Oakland, 95 F.3d 1406, 1413 (9th Cir. 1996). The NLRA “does not preempt actions taken by a state when it ... acts as a mere proprietor or market participant.” Dillingham Constr. N.A., Inc. v. County of Sonoma, 190 F.3d 1034, 1037 (9th Cir. 1999) (citing Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (“Boston Harbor”)). We conclude that California has acted as a regulator in enacting sections 16645.2 and 16645.7, and that the market participant exception does not apply.
Two Supreme Court cases define the scope of the market participant exception: Wisconsin Department of Industry v. Gould Inc., 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), and Boston Harbor, 507 U.S. at 218, 113 S.Ct. 1190.[4] In Gould, the Court addressed a Wisconsin statute that forbade state procurement agents from using state funds to purchase products manufactured or sold by “labor law violators,” i.e., employers who had violated *1083 the NLRA three times within a five-year period. 475 U.S. at 283-84, 106 S.Ct. 1057. Wisconsin conceded that it did not have the power to “bar its residents from doing business with repeat violators of the NLRA.” Id. at 287, 106 S.Ct. 1057. It argued, however, that its statutory scheme was not unlawful because the statute merely regulated the spending power of its procurement officers. Id. The Court found this to be a “distinction without a difference” because the Wisconsin statute “serve[d] plainly as a means of enforcing the NLRA.” Id. Wisconsin “concede[d], as [the Court thought] it must, that the point of [its] statute is to deter labor law violations and to reward fidelity to the law.” Id. (internal quotation marks omitted). The Court emphasized the “rigid and undiscriminating manner in which the statute operate[d],” and concluded that “[n]o other purpose could credibly be ascribed” to the statute than creating an additional remedy for violations of the NLRA. Id. at 287, 106 S.Ct. 1057.
In Boston Harbor, on the other hand, the Court held that the Massachusetts Water Resources Authority, a state agency, acted as a market participant when it required contractors working on the cleanup of Boston Harbor to agree to the terms of a project labor agreement negotiated by a project construction manager and a labor union. 507 U.S. at 232, 113 S.Ct. 1190. The Court concluded that there was “no question but that [the state agency] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost.” Id. The Court also noted that “the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project,” and that there was no reason to believe that the government was motivated by anything other than purely proprietary interests. Id.
We have applied these cases in a number of contexts without formulating a general rule about when the market participant exception applies. We have held that the market participant exception did not apply to a California law that permitted employees in state-approved apprenticeship programs to receive less than the prevailing wage, but required employees in non-approved apprenticeship programs to receive the prevailing wage. Dillingham, 190 F.3d at 1037-38 (noting that the apprenticeship standards were not “based upon unique needs that the ... project presented” and that the state was not motivated by “management concerns” in implementing the standards). On the other hand, we have applied the exception and held that the City of Oakland was a market participant when it canceled a newspaper subscription and refused to continue to pay for advertising during a labor dispute. Alameda Newspapers, 95 F.3d at 1415-16. And we have held that a city may require private contractors to adhere to the terms of a collective bargaining agreement when doing business with- the city. Associated Builders & Contractors, Inc. v. City of Seward, 966 F.2d 492, 496 (9th Cir.1992).[5]
*1084 These cases teach that when a state uses its spending power in a manner that is essentially not proprietary, the market participant exception will not apply and the state action may be subject to NLRA preemption. We draw upon the reasoning of the Fifth Circuit, which asks two discrete questions to determine when the market participant exception applies:
First, does the challenged action essentially reflect the entity’s own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem? Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out.
Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir.1999).
The first question, which looks to the nature of the expenditure, protects comprehensive state policies with wide application from preemption, so long as the type of state action is essentially proprietary. See, e.g., N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004, 1007 (7th Cir.2005) (state law requiring recipients of state grants for the construction of renewable-fuel plants to enter into a project labor agreement was not preempted, where the condition was limited to the project financed by the state grant); Bldg. & Constr. Trades Dep’t, AFL-CIO v. Allbaugh, 295 F.3d 28, 34-36 (D.C.Cir.2002) (executive order applying to all federally funded construction projects was not pre-empted, where the order concerned a project labor agreement that private employers often enter into in the construction field). The second question, which looks at the scope of the expenditure, protects narrow spending decisions that do not necessarily reflect a state’s interest in the efficient procurement of goods or services, but that also lack the effect of broader social regulation. See, e.g., Alameda Newspapers, 95 F.3d at 1417-18. Each question constitutes a separate method of determining whether the state action at issue actually constitutes regulation, and a state need not satisfy both questions to be deemed to act as a market participant.
Here, we conclude that sections 16645.2 and 16645.7 are regulatory and are not protected by the market participant exception. The statute on its face does not purport to reflect California’s interest in the efficient procurement of goods and services, as measured by the similar behavior of private parties. Rather, the statute’s preamble makes clear that the legislation’s purpose is to prevent “state funds and facilities” from being used to subsidize an employer’s attempt to influence employee choice about whether to join a union. See § 16645, Historical and Statutory Notes, Section 1 of Stats.2000, c. 872 (“It is the policy of the state not to interfere with an employee’s choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing.”).
Nor do sections 16645.2 and 16645.7 have a narrow scope or other element indicating that the statute is unrelated to broader regulation. To the contrary, the statute by design sweeps broadly, applying to all employers in California who accept any state grant or program funds in excess of $10,000. §§ 16645.2, 16645.7. It requires any business that accepts state grant or program funds in excess of *1085 $10,000 to maintain records sufficient to show that these funds were not used to assist, promote or deter organizing. Id. It contains a provision for civil penalties and permits private parties to file civil actions against employers who violate the statute. § 16645.8. The statute’s scope indicates a general state position of neutrality with regard to organizing, not a narrow attempt to achieve a specific procurement goal. These considerations counsel that sections 16645.2 and 16645.7 are regulatory measures that fall outside the market participant exception.[6]
II. NLRA Preemption
That sections 16645.2 and 16645.7 are regulatory does not mean that they are also preempted by the NLRA. “We are reluctant to infer pre-emption,” Boston Harbor, 507 U.S. at 224, 113 S.Ct. 1190, and any analysis of preemption begins with the “basic assumption that Congress did not intend to displace state law.” Mainland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Preemption is a question of congressional intent, and the “ ‘purpose of Congress is the ultimate touchstone’ of preemption analysis.” Alameda Newspapers, 95 F.3d at 1413 (quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). Although the NLRA contains no express preemption provision, the Supreme Court has articulated two distinct NLRA preemption doctrines: Machinists preemption, set forth in Lodge 76, International Ass’n of Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), and Garmon preemption, set forth in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). We hold that sections 16645.2 and 16645.7 are not preempted under either Machinists or Garmon.
A. Machinists Preemption
Machinists preemption operates as a form of labor field preemption. It requires the preemption of any state regulation of activity that, although not directly regulated by the NLRA, was intended by Congress “to be controlled by the free play of economic forces,” Machinists, 427 U.S. at 140, 96 S.Ct. 2548 (internal quotation marks and citation omitted), in a “zone free from all regulations, whether state or federal.” Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190. The doctrine “is based on the premise that ‘the use of economic pressure by the parties to a labor dispute is ... part and parcel of the process of collective bargaining,’” which means that “neither a state nor the National Labor Relations Board is ‘afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful.’ ” Alameda Newspapers, 95 F.3d at 1413 (quoting Machinists, 427 U.S. at 144, 149, 96 S.Ct. 2548). “Machinists pre-emption preserves Congress’ intentional balance between the uncontrolled power of management and labor to further their respective interests” in an area free *1086 from regulation. Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190 (internal quotation marks and citation omitted).
Federal courts of appeals have applied Machinists pre-emption in the context of collective bargaining between organized labor and employers, not in the context of organizing, which is the subject of AB 1889.[7] Machinists itself dealt with a collective bargaining dispute in which union members refused to accept overtime assignments during labor contract renewal negotiations. The Supreme Court held that “state attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB,” and that “federal labor policy and the federal Act have preempted state regulatory authority to police the use by employees and employers of peaceful methods of putting economic pressure upon one another.” 427 U.S. at 153, 154, 96 S.Ct. 2548. In Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110-11, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Court stated that “[i]n Machinists, we reiterated that Congress intended to give parties to a collective-bargaining agreement the right to make use of ‘economic weapons,’ not explicitly set forth in the Act, free of governmental interference.”[8] And in Metropolitan Life Insurance Co. v. Massachusetts, where a state statute mandating minimum healthcare benefits was held not to be preempted, the Court explained:
[.Machinists ] cases rely on the understanding that in organization and collective bargaining, Congress determined both how much the conduct of unions and employers should be regulated, and how much it should be left unregulated: The States have no more authority than the Board to upset the balance that Congress has struck between labor and management in the collective-bargaining relationship. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits. All parties correctly understand this case to involve Machinists pre-emption.
471 U.S. 724, 751, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (internal quotation marks and citation omitted).
We have also held that “Machinists preemption prohibits states from imposing restrictions on labor and management’s ‘weapon[s] of self-help’ that were left unregulated in the NLRA because Congress intended for tactical bargaining decisions and conduct ‘to be controlled by the free play of economic forces.’ ” Associated Builders & Contractors of S. Cal. v. Nunn, 356 F.3d 979, 987 (9th Cir.2004) (alteration in original) (quoting Machinists, 427 U.S. at 140, 146, 96 S.Ct. 2548); see also St. Thomas-St. John Hotel & Tourism Ass’n., Inc. v. Gov’t of U.S.V.I. ex rel. V.I. Dep’t of Labor, 357 F.3d 297, 302 n. 4 (3d Cir.2004) *1087 (“Machinists preemption is a form of conflict pre-emption under which state regulation of the bargaining conduct of private parties is displaced because it conflicts with the purpose of Congress in enacting the NLRA to leave that conduct to be controlled by the free play of economic forces.” (internal quotation marks and citation omitted)); McNealy v. Caterpillar, Inc., 139 F.3d 1113, 1117 n. 1 (7th Cir.1998) (“The Machinists doctrine similarly preempts state regulation of the economic weapons that Congress intended to leave available to unions and employers.”); Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 370-71 (8th Cir.1991) (invoking Machinists preemption in a “state’s intrusion into the bargaining process” between organized labor and an employer); Derrico v. Sheehan Emergency Hosp., 844 F.2d 22, 29 (2d Cir.1988) (“Our analysis of the [Machinists ] pre-emption issues similarly accords with the principle that the parties’ intent must govern the duration of their collectively bargained agreements.”). Insofar as all these cases concern collective bargaining, they suggest that Machinists’ principal and native application is limited to that sphere of activity, where Congress enacted an “intentional balance between the uncontrolled power of management” and organized labor to advance their respective interests in negotiating the terms and conditions of employment. Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190 (internal quotation marks and citation omitted). Correspondingly, these cases strongly suggest that the Machinists doctrine is not likely to apply to organizing, a conclusion that the Chamber of Commerce conceded during oral argument when it acknowledged that interference with organizing is “typically” analyzed under the Gannon doctrine.[9]
We need not resolve whether Machinists extends to pre-empting a state action that potentially affects organizing, because even if it did, AB 1889 would not be preempted under the Machinists doctrine. In enacting a restriction on the use of state grant and program funds with the purpose of remaining neutral in labor disputes, California has not intruded on conduct meant to be left to the free play of economic forces, an area free from all governmental regulation. Indeed, it is implausible that Congress intended the use of such funds to be an area “unregulated because left to be controlled by the free play of economic forces,” Machinists, 427 U.S. at 140, 96 S.Ct. 2548 (internal quotation marks omitted), when the state’s choices of how to spend its funds are by definition not controlled by the free play of economic forces. See Boston Harbor, 507 U.S. at 225-26, 113 S.Ct. 1190.
In any event, AB 1889’s restrictions on the use of grant and program funds do not interfere with an employer’s ability to engage in “self-help” in the sense protected by Machinists. Unlike in Gould and Golden State I, the state has not engaged in a naked attempt to use its spending power to “introduce some standard of properly balanced bargaining power” or to alter employers’ private spending decisions; Machinists, 427 U.S. at 149-50, 96 S.Ct. 2548 (internal quotation marks and citation omitted). In restricting the use of state funds, California has not made employer neutrality or the substantive terms *1088 of employment between employer and employee a condition for the receipt of state funds. Under AB 1889, an employer has and retains the freedom to spend its own funds however it wishes; it simply may not spend state grant and program funds on its union-related advocacy. In contrast, had California enacted a statute that required neutrality as a condition of receiving state funds, the employer’s use of its own funds would thereby have been curtailed. See infra pp. 1096-98.
The National Labor Relations Board (“NLRB”), which filed an amicus curiae brief in support of the Chamber of Commerce, nonetheless urges that Machinists does preempt the California statute. It cites Alto Plastics Manufacturing Corp., 136 N.L.R.B. 850, 851 (1962), for the proposition that in a representation election, “employees may select a ‘good’ labor organization, a ‘bad’ labor organization, or no labor organization, it being presupposed that employees will intelligently exercise their right to select their bargaining representative.” The NLRB contends that AB 1889 works at cross purposes with such a policy because it limits the flow of information to employees by regulating employer speech in an area — an organization election — that Congress did intend to be controlled by the free play of economic forces.
We disagree with the way in which the NLRB characterizes AB 1889 and invokes Machinists. As explained above, the California statute does not prevent an employer from using non-state funds to assist, promote or deter organizing; it only restricts a recipient’s use of state grant and program funds (in excess of $10,000) for that purpose. Consequently, the California statute does not impede the flow of information to employees by regulating employers’ speech. Employers remain free to convey their views regarding unionization, and thus to exercise their First Amendment rights, provided only that they do not use state grant and program funds to do so.[10] For example, even if an employer made a business decision to fund its operations entirely through the receipt of state grants, such that the statute effectively prevented that employer from spending any portion of its revenues to advocate during an organization election, that effect would be incidental and solely the consequence of the employer’s free-market choice. Nothing prevents the employer from raising additional funds from a non-state source and using those funds for advocacy purposes. It is well established that a legislature may attach “reasonable and unambiguous” conditions to funds that a recipient is not obligated to accept. Rumsfeld v. Forum for Academic & Institutional Rights, Inc., — U.S. -, 126 S.Ct. 1297, 1306, 164 L.Ed.2d 156 (2006) (internal quotation marks omitted); see also Lavin, 431 F.3d at 1006 (citing Rust, 500 U.S. at 173, 111 S.Ct. 1759; Nat’l Endowment for the Arts v. Finley, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). We “cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States.” Metro. Life, 471 U.S. at 757, 105 S.Ct. 2380 (internal quotation marks omitted).
More fundamentally, the NLRB is simply incorrect to suggest that Machinists preempts the California statute. As the
*1089 NLRB acknowledges elsewhere in its brief, Machinists applies solely to zones of activity left free from all regulation. See Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190. The NLRB’s own extensive regulation of organizing activities demonstrates that organizing — and employer speech in the context of organizing — is not such a zone. See, e.g., Peoria Plastic Co., 117 N.L.R.B. 545, 547-48 (1957) (NLRB barring interviews with employees in their homes immediately before an election); Peerless Plywood Co., 107 N.L.R.B. 427, 429 (1953) (NLRB barring employers and unions alike from making election speeches on company time to massed assemblies of employees within 24 hours of an election). See also NLRB v. A.J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946) (“Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.”).[11] Indeed, section 9 of the NLRA affirmatively grants the NLRB power to regulate employer and union conduct, including speech, that is prejudicial to a fair election. 29 U.S.C. § 159. In Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Supreme Court observed that the NLRB can set aside an election where a material fact has been misrepresented in the representation campaign, opportunity for a reply was lacking and the misrepresentation had an effect on the free choice of voting employees. The Court likewise noted that in a number of cases, the NLRB had even determined that use of “epithets such as ‘scab,’ ‘unfair,’ and ‘liar,’ ” though not so indefensible as to remove them from the protection of section 7, could lead the NLRB to set aside an election if such epithets had “been uttered with actual malice, a deliberate intention to falsify or a malevolent desire to injure.” Id. at 60-61, 86 S.Ct. 657 (citing Bettcher Mfg. Corp., 76 N.L.R.B. 526 (1948); Atl. Towing Co., 75 N.L.R.B. 1169, 1170-73 (1948) (internal quotation marks omitted)). See also Midland Nat’l Life Ins. Co., 263 N.L.R.B. 127, 133 (1982) (“[W]e will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made.... ”).
Significantly, the spending restrictions challenged by the Chamber of Commerce and NLRB are modeled precisely on those that Congress has enacted when prohibiting the use of federal funds to assist, promote or deter organizing. See, e.g., Workforce Investment Act, 29 U.S.C. § 2931(b)(7) (“Each recipient of funds ... shall provide to the Secretary assurances that none of such funds will be used to assist, promote, or deter union organizing.”); National and Community Service State Grant Program, 42 U.S.C. § 12634(b)(1) (“Assistance provided under this title shall not be used by program participants and program staff to ... assist, promote, or deter union organizing.”); Head Start Programs Act, 42 U.S.C. § 9839(e) (“Funds appropriated to carry out this sub-chapter shall not be used to assist, promote, or deter union organizing.”); see also Medicare Act, 42 U.S.C. § 1395x(v)(l)(N) (“In determining such reasonable costs, costs incurred for activities directly related to influencing employees respecting unionization may not be *1090 included.”). These restrictions are inconsistent with a congressional belief that union organizing involves “conduct ... intended to be unregulated.” Golden State Transit Corp., 475 U.S. at 614, 106 S.Ct. 1395 (internal quotation marks omitted). Instead, because an area left to the free play of economic forces is a “zone free from all regulations, whether state or federal,” Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190 (emphasis added), the federal restrictions are compelling evidence that the analogous conditions in AB 1889 do not intrude in a regulation-free area of labor relations and thus, contrary to the dissent’s suggestion, do not “operate to frustrate the purpose” of the NLRA. (Dissent at 11821, quoting Local 20, Teamsters v. Morton, 377 U.S. 252, 258, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).) “The fact that Congress itself has ... imposed the same type of restriction ... as [a state] seeks to impose ... is surely evidence that Congress does not view such a restriction as incompatible with its labor policies.” De Veau v. Braisted, 363 U.S. 144, 156, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (plurality opinion).[12]
In sum, the mechanism California has employed to preserve its neutrality in labor disputes does not affect an employer’s ability to use its own funds in connection with union organizing activities; nor do such activities constitute an area Congress intended to be free from all regulation. Accordingly, AB 1889 is not preempted under Machinists.
B. Garmon Preemption
Garmon preemption arises when there is an actual or potential conflict between state regulation and federal labor law due to state regulation of activity that is actually or arguably protected or prohibited by the NLRA. “When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.” Garmon, 359 U.S. at 244, 79 S.Ct. 773. Nonetheless,
[w]hile the Garmon formulation accurately reflects the basic federal concern with potential state interference with national labor policy, the history of the labor pre-emption doctrine ... does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected.
Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 188, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978).
1. Actually protected or prohibited
Section 7 of the NLRA is entitled “Right of employees as to organization, collective bargaining, etc.” 29 U.S.C. § 157. It identifies areas of protected employee conduct and can be fairly characterized as setting forth those employee practices that are actually protected by the NLRA. Section 8, conversely, is entitled *1091 “Unfair labor practices.” 29 U.S.C. § 158. By its plain terms, it sets forth activities that are actually prohibited by the NLRA. It is easy to see how both section 7 and section 8 can be implicated in a Garmon preemption analysis: if a state regulates employee activities that are actually protected under section 7, or activities of either employers or labor unions that are actually prohibited under section 8, that regulation will be preempted unless it falls within an exception to Garmon. See 359 U.S. at 243-44, 79 S.Ct. 773.
Section 8(c) prohibits sanctioning employers under the NLRA for engaging in an unfair labor practice when they exercise speech rights that are guaranteed by the First Amendment.[13] This subsection can be termed the “free speech exemption” to section 8’s delineation of unfair labor practices, because it carves out noncoercive speech from the category of actually punishable activity. Notwithstanding the dissent’s mistaken insistence to the contrary, section 8(c) does not grant employers speech rights. (Dissent at 1107.) Rather, it simply prohibits their noncoercive speech from being used as evidence of an unfair labor practice. See, e.g., NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (stating that section 8(c) “merely implements the First Amendment”); Hotel Employees, Local 2 v. Marriott Corp., 961 F.2d 1464, 1470 n. 9 (9th Cir.1992) (“[Ejection 8(e) merely states an employer does not commit an unfair labor practice by expressing its views regarding unionization.”); UAW-Labor Employment & Training Corp. v. Chao, 325 F.3d 360, 364-65 (D.C.Cir.2003) (“Fitting a Garmon claim under the language of § 8(c) is awkward.... [T]he activities described in § 8(c) ... are not ‘protected by ’ the NLRA, except from the NLRA itself.”); see also Fiber Indus., Inc., 267 N.L.R.B. 840, 841 (1983) (“[I]t is well settled that Sec. 8(c) applies only to unfair labor practice proceedings.”).
The Chamber of Commerce and dissent argue, however, that to say an activity is not punishable by the NLRA is to protect that activity. Because AB 1889’s restrictions on grant and program funds purportedly affect an employer’s ability to speak against unionization, the Chamber of Commerce and dissent urge, the statute improperly intrudes on the employer’s implied (yet somehow actually explicit in section 8(c)) NLRA speech right— as distinct from its separate First Amendment rights — and is therefore preempted under Garmon.
We reject this peculiar proposition. The Chamber of Commerce and dissent cite no authority to support it, and the NLRB itself makes no such claim as to section 8(c)’s supposed affirmative grant of speech rights. See NLRB Amicus Brief at 4, 21-26 (echoing interpretation of NLRA in cases quoted above, and noting section 8(c)’s “exemption” for non-coercive speech). Rather, some activities in labor relations are neither protected nor prohibited by the NLRA and are therefore not preempted under Garmon. See, e.g., NLRB v. Ins. Agents’ Int’l Union, 361 U.S. 477, 492-95 & n. 23, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) (finding unpersuasive the argument that because certain union activities were unprotected under section 7, those activities should also be deemed unfair labor practices under section 8, and stating that “[tjhere is little logic in assum *1092 ing that because Congress was willing to allow employers to use self-help against union tactics, if they were willing to face the economic consequences of its use, it also impliedly declared these tactics unlawful as a matter of federal law”).[14] If this were not the case, Machinists preemption would cease to exist, for Machinists addresses “activity that [i]s neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act.” Metropolitan Life, 471 U.S. at 749, 105 S.Ct. 2380.
California’s refusal to subsidize employer speech for or against unionization does not regulate an activity that is actually protected or actually prohibited by the NLRA. It does not interfere with, much less govern, “the same partisan employer speech that Congress committed to the jurisdiction of the NLRB.” (Dissent at 1107.) Nor does it infringe employers’ First Amendment rights, because employers remain free to use their own funds to advocate for or against unionization and are not required to accept neutrality as a condition for receipt of state grant and program funds. See infra pp. 1095-1097; see also Regan v. Taxation with Representation, 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (“We have held in several contexts that a legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right.”); Rust, 500 U.S. at 193, 200, 111 S.Ct. 1759; Cammarano v. United States, 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).
2. Arguably protected or prohibited
In Sears, the Supreme Court refined its Garmon pre-emption doctrine in the context of an employer’s common law trespass suit against picketing union members where the picketing was “arguably — but not definitely — prohibited or protected by federal law.” 436 U.S. at 182, 98 S.Ct. 1745. Sears divided the inquiry into two related but distinct questions: whether the state court’s jurisdiction over the trespassing claim was pre-empted (1) by the arguably prohibited nature of the picketing, or (2) by its arguably protected nature.[15]
*1093 As to whether the union’s picketing was arguably prohibited by the NLRA, Sears articulated a relatively straightforward “primary jurisdiction” test: if the claim considered by the state tribunal is identical to one that could be presented to the NLRB, the state’s jurisdiction is preempted. Id. at 197, 201, 98 S.Ct. 1745; see also Belknap, Inc. v. Hale, 463 U.S. 491, 511—12, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) (applying primary jurisdiction test to state regulation of arguably prohibited conduct). As to whether the picketing was arguably protected by the NLRA, the Court went beyond the primary jurisdiction test to address additional federal supremacy concerns: chiefly, whether preemption was warranted — despite the lack of identity between issues the state court and NLRB might consider — to protect against the “risk of misinterpretation of [the NLRA] and the consequent prohibition of protected conduct.” Sears, 436 U.S. at 203, 98 S.Ct. 1745. We employed this “primary jurisdiction plus” approach in Radcliffe v. Rainbow Construction Co., 254 F.3d 772, 786 (9th Cir.2001), where we held that state jurisdiction over claims by union members against an employer for false arrest, false imprisonment and malicious prosecution were not preempted under Garmon.[16]
Here, the parties do not dispute that the NLRB has no interest in resolving the central controversy that a state court would have to resolve in enforcing AB 1889, namely, whether state funds were used to “assist, promote, or deter union organizing.” Far from being the same as a question the NLRB might consider, a suit under the California statute would entail accounting only for the employer’s possible use of state funds.
The Chamber of Commerce, however, argues that a state court enforcing AB 1889 would in some instances need to determine whether a union was a “labor organization” under section 16647, an area that it claims is reserved to the NLRB under Marine Engineers Beneficial Ass’n v. Interlake S.S. Co., 370 U.S. 173, 178, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962). But even if the state court had to make such a determination, it would be relevant only to the ultimate question of whether an employer spent state grant or program funds to assist, promote or deter organizing, not to whether the employer’s advocacy violated the NLRA. We have previously rejected an argument that the incidental determination by a state court of whether persons were engaged “in lawful union activity” was sufficient to occasion Garmon pre-emption, where the focus of the state proceeding was on “state concerns of accommodating such union activity with the state-law rights of private property.” Radcliffe, 254 F.3d at 786. Moreover, AB 1889 is not comparable to the Minnesota statute at issue in Marine Engineers, under which a state law determination that certain groups were not labor organizations permitted the state court to regulate picketing and other activities identical to those that could have been raised before the NLRB. Marine Eng’rs, 370 U.S. at 176, 82 S.Ct. 1237.
The Chamber of Commerce also argues that because AB 1889 restricts an employer’s ability to use state funds to “influence” its employees, see § 16645(a), California *1094 courts would effectively be deciding whether employers had improperly acted under section 8(a) of the NLRA to “restraint ] or coerce employees in the exercise of the rights guaranteed in [section 7 of the NLRA].” 29 U.S.C. § 158(a)(1) (NLRA § 8(a)). However, were the NLRB to consider an unfair labor practice charge arising from the employer’s conduct, it would focus on whether the employer had interfered with the employees’ section 7 rights, regardless of whether the employer used state funds in the process. In contrast, under AB 1889, the California court would determine only whether an employer used state grant or program funds to influence employees, not whether that attempt violated the NLRA. Because the statute focuses solely on the use of state funds, there is no identity of claims, and the primary jurisdiction test is not met.[17]
We next assess whether the state statute is preempted because Congress would “prefer[ ] the costs inherent in a jurisdictional hiatus to the frustration of national labor policy which might accompany the exercise of state jurisdiction.” Sears, 436 U.S. at 203, 98 S.Ct. 1745. For essentially the same reasons explained in the primary jurisdiction analysis, there is no risk that a state court applying AB 1889 could “misinterpret ] ... federal law.” Id. Not only is there no identity of claims, but the subject matter of an AB 1889 suit is so far removed from the NLRA’s primary focus— the determination of what constitutes an unfair labor practice — -that any rationale for Garmon preemption is absent.
Sears itself is instructive. In that case, after noting the state interest in hearing trespass claims, the Court identified a clear potential overlap between the NLRB’s jurisdiction and that of the state court.
[T]he state court was obligated to decide[whether] the trespass was not actually protected by federal law, a determination which might entail an accommodation of Sears’ property rights and the Union’s § 7 rights. In an unfair labor practice proceeding initiated by the Union, the Board might have been required to make the same accommodation.
Id. at 201, 98 S.Ct. 1745. The Court further stated that the trespass at issue was arguably protected by the NLRA, whereas previously recognized exceptions to Gar-mon preemption did not “involve [] protected conduct.” Id. at 204, 98 S.Ct. 1745. Nevertheless, the Court held that the risk that a state’s regulation of trespass might impermissibly trench upon the NLRB’s jurisdiction over the speech rights of union members was too unlikely to justify usurpation of the state’s prerogative. There was no “significant risk of prohibition of protected conduct,” so the Court was “unwilling to presume that Congress intended the arguably protected character of the [regulated] conduct to deprive the California courts of jurisdiction to entertain Sears’ trespass action.” Id. at 207, 98 S.Ct. 1745.
In contrast to Sears, there is no potential overlap between the NLRB’s jurisdiction and that of a state court hearing a suit brought under AB 1889. However, even if there were some risk of overlap, California has as important and legitimate a sovereign interest in determining how the recipients of state grant and program funds use those funds as it does in entertaining trespass actions. Thus, even if AB 1889 had *1095 some peripheral and incidental effect on the arguably protected advocacy rights of employers, given the nature and mechanics of the statute (which has no concern for whether the speech at issue is protected by the NLRA, but focuses only on the source of the money funding the speech), there is no “significant risk of prohibition of protected conduct.” Id. California’s interest is so strong that we cannot “presume that Congress intended the arguably protected character of the [regulated] conduct to deprive” the state of the ability to control the use of its fisc in this modest manner. Id.
The Supreme Court has cautioned that “inflexible application of [the Garmon ] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State’s interest is one that does not threaten undue interference with the federal regulatory scheme.” Farmer v. United Bhd. of Carpenters, 480 U.S. 290, 302, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). Our “balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation,” id. at 300, 97 S.Ct. 1056, ensures that we avoid preempting state regulation of conduct that involves “interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we [cannot] infer that Congress ha[s] deprived the States of the power to act,” or where “the activity regulated [is] a merely peripheral concern” of the NLRA. Garmon, 359 U.S. at 243-44, 79 S.Ct. 773; see also Belknap, 463 U.S. at 498, 103 S.Ct. 3172. The previously recognized exceptions to Garmon preemption have involved exercises of state court jurisdiction over universally recognized common law torts, rather than, as here, the limited exercise of a state’s spending power. See, e.g., Linn, 383 U.S. at 62, 86 S.Ct. 657 (“[A] State’s concern with redressing malicious libel is ‘so deeply rooted in local feeling and responsibility’” that it is not preempted despite arguably overlapping NLRB jurisdiction over the speech at issue.) (quoting Garmon, 359 U.S. at 244, 79 S.Ct. 773). But the logic that compelled the Supreme Court to recognize the exception for certain torts applies just as powerfully, if not more so, to a state’s effort to ensure that those who accept its grant and program funds use them for the purpose for which they were given.[18]
In this sense, a state’s control of its purse strings is of at least as great a concern to the state as its power to regulate defamatory speech, violence, trespass, obstruction of access to property or the intentional infliction of emotional distress.[19] Just as the state has a responsibility to protect its citizenry from such torts, so it has a responsibility and a right to spend its treasure — largely generated from the pockets of its citizens — based on principles and guidelines that its democratically elected legislature deems to be appropriate. Such spending decisions are, *1096 of course, subject to federal supremacy concerns. But the Supreme Court has commanded us to be extremely cautious before concluding that a federal regulatory scheme intrudes upon so fundamental a state prerogative. “Whatever risk of an erroneous state-court adjudication does exist is outweighed by the anomalous consequence of a rule” that would deny the state the ability to control its fisc in the circumstances presented here. Sears, 436 U.S. at 206, 98 S.Ct. 1745. In an era of tight budgets, where many important and competing interests vie for every dollar of a state’s treasury, it is all the more important that states retain their right to control the allocation of their scarce resources. Thus, even if AB 1889’s restriction on the use of state grant and program funds intruded on an activity arguably protected or arguably prohibited by the NLRA — and we hold that it does not — Garmon’s recognized exception would save the California statute from preemption. See Garmon, 359 U.S. at 243-44, 79 S.Ct. 773.
III. First Amendment
Although we elsewhere discuss why AB 1889 does not infringe the First Amendment rights of grant and program fund recipients, see supra pp. 1087 -1089, 1092, we elaborate on our reasoning here in response to the dissent’s contention to the contrary based largely on its erroneous premise that AB 1889 compels “employers themselves to take a position of neutrality with respect to labor relations.” (Dissent at 1099.) As we explained in Section U.A., supra p. 1087, the California statute does not impose any condition on the receipt of state grant and program funds. Because an employer retains the freedom to raise and spend its own funds however it wishes — so long as it does not use state grant and program funds on union-related advocacy — AB 1889 does not infringe employers’ First Amendment right to express whatever view they wish on organizing.[20]
Accordingly, AB 1889’s effect on speech is properly considered in light of Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In Rust, the Court held that “[b]y requiring that the ... grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has ... not denied it the right to engage in abortion-related activities.” Id. at 198, 111 S.Ct. 1759. In short, a restriction on the use of government funds for an activity does not compel cessation of the activity.
Here, California has not “denied” employers the “right to engage in [union]related activity,” but has “merely refused to fund such activities out of the public fisc.” Id. This conclusion follows from the Court’s familiar observation about what is regulation and what is not. “[A] legislature’s decision not to subsidize the exercise of a ... right does not infringe the right.” Regan, 461 U.S. at 546, 549, 103 S.Ct. 1997 (rejecting the “notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State”); see also Lyng v. Int’l Union, UAW, 485 U.S. 360, 368-69, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988). The legislature can “insist[ ] that public funds be spent for the purposes for which they [a]re authorized,” even if doing so forbids the use of government funds for other speech. Rust, 500 U.S. at 196, 111 S.Ct. 1759; see also United States v. Am. Library Ass’n, 539 U.S. 194, 212, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003). California, in enacting AB 1889, *1097 has simply availed itself of that prerogative.[21]
Nor is there any merit to the dissent’s assertion that AB 1889 violates employers’ First Amendment Rights by “irrevocably stamp[ing] dollar bills with ‘Property of California’ ” and “limiting] the items an employer may purchase with these specific dollar bills.” (Dissent at 1099.) The dissent’s parade of horribles goes far beyond the scope of plaintiffs’ facial challenge to sections 16645.2 and 16645.7 and the record before us. The district court made no findings, nor is there evidence, that AB 1889 “co-opts the payment for goods and services and profit realized under a contract.” (Dissent at 1098.)[22] Consistent with Rust, the California statute, like various federal acts, requires only that those who accept government grant and program funds use them for the purpose for which they were given. Our construction of AB 1889 is “readily apparent,” Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (internal quotation marks and citation omitted), but even were it not, the statute is not “overly broad and unconstitutional” (Dissent at 1100) because its restrictions on the use of grant and program funds have been “carefully drawn” to mirror the mechanics of constitutionally sound federal acts. Gooding, 405 U.S. at 522, 92 S.Ct. 1103; see also Regan, 461 U.S. at 549-50, 103 S.Ct. 1997.
It is even more implausible that AB 1889’s restrictions on grant and program funds “alter [the funds’] use as legal tender” and frustrate the “basic tenets of our economic system.” (Dissent at 1098, 1099) Again, the statute’s text is precisely modeled on language the Congress itself has used. The Workforce Investment Act, for example, regulates federal funds given to state boards to be awarded as “grants or contracts, on a competitive basis, to eligible providers within the State or outlying area to enable the eligible providers to develop, implement, and improve adult education or literacy activities within the State.” 20 U.S.C. § 9241(a) (emphasis added). The Workforce Investment Act also requires “[e]ach recipient of funds ... [to] provide ... assurances that none of such funds will be used to assist, promote, or deter union organizing.” 29 U.S.C. § 2931(b)(7). AB 1889’s exactly analogous requirement can hardly be antithetical to the monetary concept of free tender.[23]
*1098 CONCLUSION
Because sections 16645.2 and 16645.7 of AB 1889 are not preempted under either Machinists or Garmon and do not on their face infringe plaintiffs’ First Amendment rights, the judgment of the district court is REVERSED and its injunction is VACATED. We remand for further proceedings consistent with this opinion.

. The parties stipulated to the district court's entry of a partial final judgment as to preemption of § 16645.2 and § 16645.7 to facilitate prompt appellate review of the district court's preemption ruling regarding these two sections only.

. Despite the absence of any finding by the district court that § 16645.2(c) and § 16645.7(c) are onerous, the dissent insists that these provisions entail “burdensome and detailed record-keeping,” impose "seemingly impossible compliance burdens” and are "daunting.” (Dissent at 1102, 1103.) The dissent even suggests that these provisions require "an employer [to] create and maintain two completely separate accounting and payroll systems.” (Dissent at 1103.) The statute, however, does not require "employers to maintain records in any particular form,” § 16648, and leaves employers free to design their accounting and payroll systems however they wish, provided only that they have "records sufficient to show that state funds have not been used” to assist, promote or deter organizing. §§ 16645.2(c), 16645.7(c). Moreover, the only expert testimony in the record on these provisions states that they provide employers "flexibility in establishing proper accounting procedures and controls,” impose no burden greater than numerous other common grant restrictions and in fact "appear to be significantly less burdensome than the detailed requirements for federal grant recipients. ...”

. The dissent finds it significant that the statute allows private taxpayers to sue suspected violators. (Dissent at 1102.) In this respect, the statute is no different from any number of other federal and state laws or qui tarn causes that enable private attorneys general to help detect, punish and deter wrongdoing. In contrast to some such statutes (e.g., § 4 of the Clayton Act, 15 U.S.C. §. 15), which encourage private suits by permitting plaintiffs to be awarded treble damages, AB 1889 only allows private litigants to recover attorney’s fees and costs — the damages go to the state. See § 16645.8(d).

. Our discussion here is limited to the context of the market participant exception under the NLRA. A market participant exception exists in a number of other contexts, such as cases under the Commerce Clause. See, e.g., Big Countiy Foods, Inc. v. Bd. of Educ. of Anchorage, 952 F.2d 1173, 1177-79 (9th Cir.1992) (discussing market participant exception in the dormant Commerce Clause context). We do not opine on the applicability of our reasoning to the market participant exception in these other contexts.

. City of Seward, which was decided before Boston Harbor, creates some confusion about the relation of the market participant exception to other NLRA preemption doctrines. City of Seward concluded that “action taken by the state as a market participant is not automatically immune from NLRA preemption.” 966 F.2d at 495. Boston Harbor, however, held explicitly that the "[NLRA] preemption doctrines apply only to state regulation,” and that “a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor.” 507 U.S. at 227, 229-30, 113 S.Ct. 1190. Boston Harbor, therefore, makes clear that once a state’s action falls within the "market participant” exception, it is not preempted under the NLRA. To the extent that City of Seward states otherwise, we hold it overruled.

. This case is thus distinct from Alameda Newspapers, where we concluded that a city’s proclamation of support in favor of a labor union in an ongoing strike at a local newspaper, and the city’s decision to refrain from purchasing advertisements and to cancel its subscriptions as a result of the strike, did not constitute regulation subject to NLRA preemption. 95 F.3d at 1409. There, we emphasized the merely exhortatory nature of the proclamation, noting that "[t]he resolution ha[d] no binding force on anyone.” Id. at 1414. We also concluded that the city's cancellation of subscriptions and refusal to advertise did not "have some 'real effect’ or practical economic impact on the employer that [wa]s either different from that of the ordinary customer or ... otherwise governmental in nature.” Id. at 1416.

. The dissent contends that Machinists preempts AB 1889 because the California statute “specifically targets and substantially affects the NLRA bargaining process.” (Dissent at 1106 (emphasis added).) But AB 1889 applies only to organizing, not collective bargaining.

. In the Court's 1989 Golden State Transit Corp. decision, it held that the taxi company was entitled to maintain a § 1983 action against Los Angeles for the city's violation of the company’s right (as stated in the Court's 1986 decision, Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) ("Golden State /”)), to be free from interference with its choice and use of economic weapons in the collective bargaining process. In Golden State I, the Court had held that the city’s refusal to renew the taxi company’s franchise because the company’s employees were on strike was preempted under Machinists.

. Secondary sources also discuss Machinists in the context of collective bargaining, not organizing. See, e.g., N. Peter Lareau, 2 Labor and Employment Law 36.11-36.17 (2005); Robert A. Gorman, Labor Law 1103-10 (2004); Patrick Hardin et al., 2 The Developing Labor Law 2192-99 (2002); Robert Ra-chai, Machinists Preemption Under the NLRA: A Powerful Tool to Protect an Employer’s Freedom to Bargain, 58 La. L.Rev. 1065, 1065 (1998) (“To protect the collective bargaining process from [attempts by government to alter collective bargaining], the Supreme Court developed Machinists preemption.’’).

. The statute's effect is therefore indirect and incidental, not unlike the Massachusetts law upheld in Metropolitan Life. See 471 U.S. at 755, 105 S.Ct. 2380 ("Minimum state labor standards ... neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act.'').

. Like the NLRB, the dissent undermines its own argument when it cites Board decisions as examples of the NLRB's regulation of the organizing process. (Dissent at 1105.) Machinists applies only to zones free from all regulation, and the NLRB decisions show that organizing is not such a zone. "A state law that both explicitly targets and directly regulates processes controlled by the NLRA” might be preempted under Garmon, see infra p. 1090, but is surely not preempted "under the Machinists doctrine.” (Dissent at 1105.)

. The Supreme Court engaged in similar reasoning in Metropolitan Life, 471 U.S. at 754-55, 105 S.Ct. 2380. There, the Court held that no incompatibility existed between national labor policy expressed in federal rules designed to restore the equality of bargaining power and state legislation that imposed minimal substantive requirements (in the form of healthcare benefits) on contract terms negotiated between parties to labor agreements. The Court reached this conclusion by noting, among other things, that it made no sense to infer that Congress intended the NLRA to deprive states of the ability to take such action when Congress itself passed similar federal laws applying to unionized employers and employees.

. Entitled “Expression of views without threat of reprisal or force or promise of benefit,” § 8(c) provides that ”[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.” 29 U.S.C. § 158(c).

. See also UAW-Labor Employment & Training Corp., 325 F.3d at 363-64 (“The dissent makes a similar error when it suggests that the order is preempted because it conflicts with the 'regulatory scheme’ the Board has established. This would be a sound analysis under 'field' preemption, but Garmon works differently, operating only as to activities arguably protected or prohibited, not to ones simply left alone, even if left alone deliberately.” (internal citations omitted)).

. The dissent argues that we err in considering whether AB 1889 is pre-empted by interfering unduly with an arguably protected or prohibited activity because, in the dissent’s idiosyncratic and incorrect view, the real cause of Garmon preemption is AB 1889’s alleged interference with actually protected conduct — the speech rights purportedly granted under § 8(c). (Dissent at 1109.) Insofar as the dissent suggests we apply Sears to avoid addressing whether AB 1889 is preempted by interfering with an actually protected activity (Dissent at 1108), its claim ignores our express repudiation of that argument in Section II.B.l supra. To the extent the dissent contends we err in even analyzing whether AB 1889 interferes with arguably protected or prohibited conduct (id. at 1108, 1109), it neglects the Chamber of Commerce’s own contention that the statute does so, and fails to recognize that such analysis is orthodox in Garmon analysis. See, e.g., Local 926, Int’l Union of Operating Eng'rs v. Jones, 460 U.S. 669, 676, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983) ("Our approach to the pre-emption issue has thus been stated and restated. First, we determine whether the conduct that the State seeks to regulate or to make the basis of liability is actually or arguably protected or prohibited by the NLRA. Although the Garmon guidelines [are not to be applied] in a literal, mechanical fashion, if the conduct at issue is arguably prohibited or protected otherwise applicable state law and procedures are ordinarily pre-empted.” (internal quota *1093 tion marks and citations omitted) (alteration in original) (emphasis added)).

. In Radcliffe, defendants argued that “the validity of the plaintiffs’ claims ... turns on whether the union activities carried on by the plaintiffs were ... protected by § 7 of the NLRA.” 254 F.3d at 785.

. There is no merit to the Chamber of Commerce’s claim that the California statute provides an additional remedy for NLRA violations. The statute's damages provisions are intended to remedy the misuse of state funds under the statute, regardless of whether any NLRA violation has occurred.

. For instance, suppose California granted money to hospitals to create more nurse positions and did not want the effectiveness of its grants diminished by funding a campaign to convince nurses not to unionize. So long as the hospitals remained free to lobby nurses with their own monies, California would be well within its rights to insist that its grants be used for the purpose for which they were given — the creation of needed nursing positions.

. See Linn, 383 U.S. at 63-64, 86 S.Ct. 657; Youngdahl v. Rainfair, Inc., 355 U.S. 131, 139-40, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957); Sears, 436 U.S. at 207, 98 S.Ct. 1745; Int’l Union, United Auto. Workers of America (UAW-CIO) v. Russell, 356 U.S. 634, 644-46, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); Farmer, 430 U.S. at 302-06, 97 S.Ct. 1056.

. For instance, California agreed during oral argument that nothing in AB 1889 prevents a closed corporation that receives 100% of its revenues from the state from using its own funds to assist, promote or deter organizing, where the corporation receives those funds as a capital contribution by a shareholder who reinvested a legitimately distributed corporate dividend — itself the fruit of the receipt of state grant or program funds.

.The dissent questions the legitimacy of AB 1889 because the statute was "sponsored by the California Labor Federation, AFL-CIO, and supported by a phalanx of labor unions.” (Dissent at 1102.) Not only is this an irrelevant consideration, but it also is not up to us as judges to impugn the California legislature’s motives. As the Seventh Circuit wisely observed in Lavin:
If (as seems likely) Illinois has taken the approach in this law because state officials want to assist organized labor as well as the farmers who supply the grain to be made into ethanol and the owners of ethanol plants, that is neither a surprise nor a reason for invalidity. Most legislation is the product of coalitions among interest groups. Boston wanted to clean up its harbor, but there can be little doubt that it also wanted to shower benefits on workers who were the incumbents’ political supporters .... Federal preemption doctrine evaluates what legislation does, not why legislators voted for it or what political coalition led to its enactment. This statute does not affect people who spurn the state’s largesse.
431 F.3d at 1007 (emphasis added).

. As noted previously, supra note 1, the only issue before us is whether AB 1889's grant and program fund restrictions, § 16645.2 and § 16645.7, are preempted by the NLRA or are constitutionally invalid. The statute's restriction on the use of contract funds, § 16645.4, is not at issue nor was it addressed by the district court, and the dissent errs in implying otherwise. (Dissent at 1098 - 1100.)

. The dissent also disregards the nature of state programs, which are run to serve public purposes and need not guarantee a profit to private companies. (Dissent at 1100.) For instance, in the MediCal program, which the Chamber of Commerce itself discusses in the *1098 context of nursing homes that are “entirely dependent on state funds,” state funding is designed only to cover the costs of services performed. Notably, allowable costs under MediCal are also based on federal Medicare cost reporting standards, which provide that "[i]n determining such reasonable costs, costs incurred for activities directly related to influencing employees respecting unionization may not be included." 42 U.S.C. § 1395x(v)(l)(N) (emphasis added).